Pecola Annette **WRIGHT** et al.

v.

**COUNTY SCHOOL BOARD OF GREENS-VILLE COUNTY, VIRGINIA** et al.

**Civ. A. No. 4263.**

United States District Court,
E. D. Virginia,
Richmond Division.

March 2, 1970.

---

S. W. Tucker, Henry L. Marsh, III, Richmond, Va., Jack Greenberg, James M. Nabrit, III, New York City, for plaintiffs.

Frederick T. Gray, Richmond, Va., H. Benjamin Vincent, Emporia, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

The plaintiffs in this action filed a supplemental complaint on August 1, 1969, alleging that the added defendants, the City Council and the School Board of the City of Emporia, had taken steps to establish a city school system independent of the Greensville County system, then under a desegregation order in this suit. Emporia, a city of the second class since 1967, is surrounded by Greensville County. Through the school year 1968–69 public school pupils resident in Emporia had attended schools operated by Greensville County; the city had been reimbursing the county for this service under a contract of April 10, 1968.

On August 8, 1969, the added defendants were temporarily enjoined by this Court from any steps which would impede the implementation of the outstanding desegregation order. Subsequently the Emporia officials answered, denying the allegation that the plan for separation would frustrate the efforts of the Greensville County School Board to implement the plan embraced by the Court's order. The matter was then continued

until December 18, 1969, for a hearing on whether the injunction should be made permanent.

The original action seeking relief from alleged racial discrimination in the operation of the Greensville County School System, was filed in March of 1965. Emporia was not a city under Virginia law until July 31, 1967; until that time the county was alone responsible for the public education of those within its borders. Under the contract of April 10, 1968, the county continued this service in exchange for the payment of 34.26% of the cost of the system.

On June 21, 1968, the plaintiffs moved for additional relief. Up to that point the county-administered system had operated under a free-choice plan which, plaintiffs asserted, had not achieved constitutional compliance under Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716 (1968). The 1967–68 enrollment figures show the racial distribution then prevailing:

| School | Students | | Faculty | |
|---|---|---|---|---|
| | W | N | W | N |
| Greensville County High | 719 | 50 | 39½ | 1 |
| Emporia Elementary | 857 | 46 | 34½ | 2 |
| Wyatt High | 0 | 809 | 4½ | 32½ |
| Moton Elementary | 0 | 552 | 0 | 22½ |
| Zion Elementary | 0 | 255 | 1 | 12½ |
| Belfield Elementary | 0 | 419 | 3 | 14 |
| Greensville County Training | 0 | 439 | 0 | 16 |

The two schools then attended by all the white students were and still are in the city of Emporia, as is the training school; others are in the county.

The county proposed the extension of the free choice plan for another year while a zoning or pairing plan was developed. The plaintiffs took exception. The Court ordered the county to file a pupil desegregation plan bringing the system into compliance with *Green* by January 20, 1969. The county again proposed that the free choice plan be retained with certain changes, principally involving transfers out of a pupil's regular school for special classes and faculty reassignment. As an alternative, if the first proposal were rejected, the county suggested a plan under which the high school population would be divided between the two facilities on the basis of curriculum pursued, academic or vocational. Faculties would be reassigned to achieve at least a 75%–25% ratio in each school. Elementary school desegregation would be achieved by the transfer of individual Negroes to white schools "on the basis of standardized testing of all students."

The plaintiffs suggested the assignment of all students on the basis of grades attained to specific schools; pairing, in other words, the entire system. Elementary teachers were to follow their classes as reassigned, and high school teachers were to be shifted so that the racial balance in the Wyatt School and Greensville County High would be approximately the same.

A hearing was held on June 17, 1969, and this Court stated its findings and indicated its intention to order that the plaintiffs' plan be adopted.

By order of June 25, 1969, this Court rejected the defendants' proposals and ordered the plaintiffs' plan put into ef-

fect. Subsequently the plan was modified slightly on defendants' motion; the pupil assignments ordered on July 30, 1969, were as follows:

| School | Grades |
|--------|--------|
| Greensville County High | 10, 11, 12 |
| Junior High (Wyatt) | 8, 9 |
| Zion Elementary | 7 |
| Belfield Elementary | 5, 6 |
| Moton Elementary | 4, 5 |
| Emporia Elementary | 1, 2, 3 |
| Greensville County Training | Special Education |

On July 9, 1969, the city council met especially to formulate plans for a city school system. On July 10th the mayor sought the cooperation of county officials in selling or leasing school facilities located in Emporia. On July 14th the council instructed the city school board to take steps to create a city school division. On July 23rd the council requested the state board of education to authorize the establishment of such a division, which request has been tabled by the State Board "in light of matters pending in the federal court," defendants' Ex. E–1. The Emporia school board in the meantime advised the county officials that the contract would no longer be honored and that city pupils would not attend the county system in the forthcoming school year. A notice of July 31, 1969, published by the city school board, required that school age children resident in Emporia be registered and invited applications from nonresidents on a tuition basis. The injunction of August 8, 1969, however, resulted in a continuation of city pupils attending the county system for the present school year.

At a hearing on December 18, 1969, the city took the position that the contract was void under state law (see defendants' Ex. E–J); this question is the subject of pending litigation brought by the city on October 1, 1969, in the state courts. The evidence shows that the city on September 30, 1969, notified the county of its view that the contract is invalid and its intention to terminate the contract under its terms, in any case, effective in July, 1971. Payments, however, were continued through the date of the December hearing. Emporia officials also have assured the Court that they have no intention of entertaining applications from nonresidents until so permitted by this Court.

At the hearing the county, unfortunately, took no position.

A resolution of the city school board of December 10, 1969, defendants' Ex. E–F, outlines the city's plan. Elementary levels through grade six would be conducted in the Emporia Elementary School building; grades seven through twelve would be housed in the Greensville County High School. Defendants' Ex. E–G includes budgetary projections for the new system. The city projects enrollment figures for the system at about ten percent above the number of city residents now in the public system "on the expectation that some pupils now attending other schools would return to a city-operated school system," defendants' Ex. E–G, at 1.

The city clearly contemplates a superior quality educational program. It is anticipated that the cost will be such as to require higher tax payments by city residents. A kindergarten program, ungraded primary levels, health services, adult education, and a low pupil-teacher ratio are included in the plan, defendants' Ex. E–G, at 7, 8.

The county has filed, at the Court's request, a statistical breakdown of the students and faculty in the county-administered schools, now in operation under this Court's order of July 30, 1969. The table below shows the current racial makeup of the seven schools:

| School | Students | | Faculty | |
|---|---|---|---|---|
| | W | N | W | N |
| Emporia Elementary Grades 1–3 | 283 30.1% | 655 69.9% | 17 | 18 |
| Hicksford (Moton) Grades 4–5 | 238 37% | 405 63% | 11 | 13 |
| Belfield Grade 6 | 107 30.6% | 243 69.4% | 7 | 11 |
| Zion Grade 7 | 127 34.8% | 238 65.2% | 7 | 7 |
| Junior High Grades 8–9 | 215 32.6% | 443 67.4% | 19 | 21 |
| Senior High Grades 10–12 | 346 44.9% | 424 55.1% | 31 | 14 |
| Training School | 10 13.7% | 63 86.3% | 1 | 8 |

◆

By comparison, the county reported the following racial characteristics for the 1968–69 school year:

| School | Students | | Faculty | |
|---|---|---|---|---|
| | W | N | W | N |
| Greensville County High | 720 | 45 | 39 | 1 |
| Wyatt H.S. (present Jr. High) | 0 | 829 | 5 | 34 |
| Emporia Elementary | 771 | 53 | 33 | 3 |
| Moton( present Hicksford) | 0 | 521 | 5 | 18 |
| Zion | 0 | 248 | 1 | 13 |
| Greensville County Training | 0 | 387 | 0 | 17 |
| Belfield | 0 | 427 | 2 | 16 |

◆

The procedural status of the case at present needs clarification. The plaintiffs contend that no one has made application to this Court that its order of June 25, as modified on July 30, be amended. This is the outstanding desegregation order addressed to "the defendants herein, their successors, agents, and employees." They contend that this Court is therefore limited to the inquiry whether the city officials threaten to interfere with the implementation of the order and therefore should be permanently enjoined.

Some passages in the city officials' briefs support this contention. In their

rebuttal brief they state that the city is not seeking any sort of judicial relief excepting that the injunction of August 8, 1969, be lifted. They contend that any change in the existing desegregation order would be "a matter to be resolved by the Court, the plaintiffs and Greensville County, and would not involve the city." [Rebuttal brief of January 23, at 3.] Such a position, however, is inconsistent with that taken by counsel at the December 18th hearing. Issues explored went beyond the question whether the city's initiation of its own system would necessarily clash with the administration of the existing pairing plan; indeed there seems to be no real dispute that this is so. The parties went on to litigate the merits of the city's plan, developing the facts in detail with the help of an expert educator. Counsel for the city stated that "at the conclusion of the evidence today, we will ask Your Honor to approve the assignment plan for the 1970–71 school year and to dissolve the injunction now, against the city, effective at the end of this school year," Tr., Dec. 18, at 11.

It seems clear that the supplemental complaint sought to join the city officials not so much as successors, in full or in part, to the official powers and interests of the original defendants, but rather as persons who intended to use state powers to interfere with the plaintiffs' enjoyment of their constitutional right to unsegregated public education. Ample precedent exists for authority to grant relief in such a case. Faubus v. United States, 254 F.2d 797 (8th Cir., 1958); Lee v. Macon County Board of Education, 231 F.Supp. 743 (M.D.Ala. 1964). Indeed such orders have issued against private parties, on occasion, even at the instance of state officials, Kasper v. Brittain, 245 F.2d 92 (6th Cir. 1957); Brewer v. Hoxie School District No. 46, 238 F.2d 91 (8th Cir. 1956). Plaintiffs did not specifically request then or since that the city officials be joined or substituted as parties defendant pursuant to Fed.Rules Civ.Proc., Rule 25(c), or Rule 25(d), 28 U.S.C.

Nevertheless, this Court has concluded that the plaintiffs' failure to so move was, under the circumstances, excusable and indeed unnecessary. The city defendants, by their actions, have made it clear that, according to state law, they have succeeded to the powers of the county board members over public school students resident in the city. They now desire to exercise these latent powers and have asked this Court to amend its orders to enable them to so do. A word about the Virginia education law aids in understanding this aspect of the case.

When Emporia became a city the duty fell upon it to establish a school board to supervise public education in the city. §§ 22–2, 22–93, 22–97, Va.Code Ann., 1950. State law permits, however, the consolidation of a city with a county to form a single school division, with the approval of the State Board of Education, § 22–30, Va.Code Ann., 1950. In such a case a single school board may be established with the approval of both governmental units. § 22–100.2, Va. Code Ann., 1950; the individual boards would then cease to exist, § 22–100.11, Va.Code Ann., 1950. Alternatively, the two boards might remain in existence and meet jointly to choose a division superintendent, § 22–34, Va.Code Ann., 1950. There is provision as well for the establishment of jointly owned schools, § 22–7, Va.Code Ann., 1950. When a city contracts with a county for the provision of school services, moreover, there is specific provision that the county board shall include representatives of the city, § 22–99, Va.Code Ann., 1950. Therefore, once it became a city, there is no doubt that Emporia succeeded to the state-law powers and duties of actively administering public schools for its residents under one of these statutory schemes. It has not, however, until recently sought to exercise that power. Only after the June order did the city move to assume the powers that it had, by contract, delegated to the county, plaintiffs' exhibit 12.

Under federal practice, an injunction may not issue against and bind all the world. The persons whose con-

duct is governable by court order are defined by rule:

> Every order granting an injunction * * * is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise. Fed. Rules Civ.Proc., Rule 65(d), 28 U.S.C.

This rule fixes the scope of valid orders, and terms in a decree exceeding the rule are of no effect, Swetland v. Curry, 188 F.2d 841 (6th Cir. 1951); Alemite Mfg. Co. v. Staff, 42 F.2d 832 (2d Cir. 1930); Baltz v. The Fair, 178 F.Supp. 691 (N.D. Ill.1959); Chisolm v. Caines, 147 F.Supp. 188 (E.D.S.C.1954). In general, only those acting in concert with, or aiding or abetting, a party can be held in contempt for violating a court order. One whose interest is independent of that of a party and who is not availed of as a mere device for circumventing a decree is not subject to such sanctions, United Pharmacal Corp. v. United States, 306 F.2d 515, 97 A.L.R.2d 485 (1st Cir. 1962). The law exposes to summary punishment only those who have already had their rights adjudicated in court. Consistent with these limitations, a court will only order a public official to perform or refrain from certain acts which are within the powers conferred upon him by law, Bell v. School Board of Powhatan County, 321 F.2d 494 (4th Cir. 1963), and will deny relief when those parties before it are not fully empowered, under state law, to take the action requested, Thaxton v. Vaughan, 321 F.2d 474 (4th Cir. 1963).

▮▮ Under these precedents one might conclude that, because the city officials were not parties to any of the proceedings in this case prior to the filing of the supplemental complaint, they are therefore not bound by decrees in that litigation. But a line of cases involving public officers has also evolved holding that a decree may bind one who

succeeds to the powers exercised by the officer who was a party to the original suit. In Regal Knitwear Co. v. N. L. R. B., 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661 (1945), the Supreme Court recognized that a decree might bind "successors" to a private litigant, at least if they came within the usual "privity" doctrines. Lucy v. Adams, 224 F.Supp. 79 (N.D.Ala.1963), held that the successor to a state university dean of admissions was bound by a decree against his predecessor so long as he had notice of the injunction. In Lankford v. Gelston, 364 F.2d 197, 205 n. 9 (4th Cir. 1966), an injunction against a police official or his successor was expressly endorsed. The injunction of June 25, 1969, as mentioned above, issued against the county officials or their successors. No one contests that the city officers had notice of the decree. The Emporia officials in a very real sense appear now to have succeeded, under state law, to the part of the county officers' powers and thus are amenable to the decree.

It is irrelevant that the city officials hold positions that differ in name from those of the original parties. Substitution in analogous situations has been effectuated under Fed.Rules Civ.Proc. Rule 25(d) 28 U.S.C., when the relevant functions have been moved from one office to another, Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947); Toshio Joji v. Clark, 11 F.R.D. 253 (N.D.Cal.1951); Porter v. American Distilling Co., 71 F.Supp. 483 (S.D.N.Y.1947), cf. Skolnick v. Parsons, 397 F.2d 523 (7th Cir. 1968).

The city might have moved for substitution under Fed.Rules Civ.Proc., Rule 25(d), but its failure to do so is quite excusable. The county officials were under contract to operate the schools, and the question of the validity of that instrument was not raised. Greensville County officials were in possession of the schools whereas the city board was by all indications asserting no control. The county board, when ordered to take certain steps in the exercise of its power

over the public school pupils of the city and the county, did not protest its lack of power. It may yet possess power over both city and county residents, at least for the term of the contract. But the city's actions subsequent to the pairing decree, and in particular the pending suit to declare the contract void, cast great doubt on the county's authority under state law. To all appearances the city board, but for and subject to the decree of this Court ordering non-interference, now has the power under state law to administer schools for the city residents. Certainly it must have such power, even if the contract is valid, commencing July 1, 1971.

As a successor in interest to a party to the original decree, it would seem that the city school board now has sufficient standing under Fed.Rules Civ.Proc., Rule 60(b), 28 U.S.C., to move to amend the outstanding decree. Those cases holding such relief to be unavailable to nonparties concern chiefly the applications of persons who did not have an interest in the judgment identical to that of the original party, Mobay Chemical Co. v. Hudson Foam Plastics Corp., 277 F.Supp. 413 (S.D.N.Y.1967); United States v. 140.80 Acres of Land, 32 F.R.D. 11 (E.D.La.1963); United States v. International Boxing Club, 178 F.Supp. 469 (S.D.N.Y.1959). The present standing of the city board members is still problematical because the validity of the contract has not been finally adjudicated. But it is clear that they will enjoy the relevant powers at least in the 1971–1972 school year, and sooner if they succeed in their litigation; this puts them in a position to move to modify the decree.

■ The Court therefore must proceed to the merits of the city's plan, treating the school board's application, as discussed above, as a motion under Fed.Rules Civ.Proc., Rule 60(b), 28 U.S.C.

The county board has provided data on the composition of the student body of each school as currently operated, broken down by race and by place of residence. The tables below are based upon that information:

Overall System, September 1, 1969
Students by race and residence:

|  | White | Negro | Total | % White | % Negro |
|---|---|---|---|---|---|
| County: | 728 | 1888 | 2616 | 27.8% | 72.2% |
| City: | 543 | 580 | 1123 | 48.3% | 51.7% |
| Total | 1282 | 2477 | 3759 | 34.1% | 65.9%[1] |

The establishment of separate systems would plainly cause a substantial shift in the racial balance. The two schools in the city, formerly all-white schools, would have about a 50–50 racial makeup, while the formerly all-Negro schools located in the county which, under the city's plan, would constitute the county system, would overall have about three Negro students to each white. As mentioned before, the city anticipates as well that a number of students would return to a city system from private schools. These may be assumed to be white, and such returnees would accentuate the shift in proportions.

The city contemplates placing grades one through six in the Emporia Elementary School building. Such a school would have 314 Negro students and 270 white; 46.2% white and 53.8% Negro. A city high school incorporating grades seven through twelve would have 252 Negro students and 271 white; this would make for a ratio of 51.8% white to 48.2% Negro pupils.

Figures secured from Greensville County school system; total students include 11 white and 9 Negro, who apparently reside outside both county and city.

The impact of separation in the county would likewise be substantial. The distribution of county residents, by grade and race, is as follows:

|  | White | Negro |
|---|---|---|
| Grades 1–3 | 167—26.3% | 468—73.7% |
| Grades 4–5 | 142—31.1% | 314—68.9% |
| Grade 6 | 57—23.5% | 185—76.5% |
| Grades 7–9 | 192—27.5% | 506—72.5% |
| Grades 10–12 | 161—30.6% | 365—69.4% |

These figures should be compared with the current percentages reported by the county, given in a table above. At each level the proportion of white pupils falls by about four to seven percent; at the high school level the drop is much sharper still.

The motives of the city officials are, of course, mixed. Ever since Emporia became a city consideration has been given to the establishment of a separate city system. A second choice was some form of joint operating arrangement with the county, but this the county would not assent to. Only when served with an "ultimatum" in March of 1968, to the effect that city students would be denied access to county schools unless the city and county came to some agreement, was the contract of April 10, 1968, entered into. Not until June of 1969 was the city advised by counsel that the contract was, in all probability, void under state law. The city then took steps to have the contract declared void and in any event to terminate it as soon as possible.

Emporia's position, reduced to its utmost simplicity, was to the effect that the city leaders had come to the conclusion that the county officials, and in particular the board of supervisors, lacked the inclination to make the court-ordered unitary plan work. The city's evidence was to the effect that increased transportation expenditures would have to be made under the existing plan, and other additional costs would have to be incurred in order to preserve quality in the unitary system. The city's evidence, uncontradicted, was to the effect that the board of supervisors, in their opinion, would not be willing to provide the necessary funds.

While it is unfortunate that the county chose to take no position on the instant issue, the Court recognizes the city's evidence in this regard to be conclusions; and without in any way impugning the sincerity of the respective witnesses' conclusions, this Court is not willing to accept these conclusions as factual simply because they stand uncontradicted. Assuming arguendo, however, that the conclusions aforementioned are indeed valid, then it would appear that the Court ought to be extremely cautious before permitting any steps to be taken which would make the successful operation of the unitary plan even more unlikely.

The Court does find as a fact that the desire of the city leaders, coupled with their obvious leadership ability, is and will be an important facet in the successful operation of any court-ordered plan.

Dr. Tracey, a professor of education at Columbia University, felt that the county budget had not even been increased sufficiently to keep up with inflation in the 1969–1970 year, and that it seemed that certain cutbacks had been made in educational programs, mainly to pay for increased transportation costs. In Dr. Tracey's opinion the city's projected budget, including higher salaries for teachers, a lower pupil-teacher ratio, kindergarten, ungraded primary schooling, added health services, and vocational education, will provide a substantially superior school system. He stated that the smaller city system would not allow a high

school of the optimum size, however. Moreover, the division of the existing system would cut off county pupils from exposure to a somewhat more urban society. In his opinion as an educator, given community support for the programs he envisioned, it would be more desirable to apply them throughout the existing system than in the city alone.

While the city has represented to the Court that in the operation of any separate school system they would not seek to hire members of the teaching staff now teaching in the county schools, the Court does find as a fact that many of the system's school teachers live within the geographical boundaries of the city of Emporia. Any separate school system would undoubtedly have some effect on the teaching staffs of the present system.

Dr. Tracey testified that his studies concerning a possible separate system were conducted on the understanding that it was not the intent of the city people to "resegregate" or avoid integration. The Court finds that, in a sense, race was a factor in the city's decision to secede. This Court is satisfied that the city, if permitted, will operate its own system on a unitary basis. But this does not exclude the possibility that the act of division itself might have foreseeable consequences that this Court ought not to permit. Mr. Lankford, chairman of the city school board, stated:

> Race, of course, affected the operation of the schools by the county, and I again say, I do not think, or we felt that the county was not capable of putting the monies in and the effort and the leadership into a system that would effectively make a unitary system work * * *, Tr.Dec. 18, at 28.

Mr. Lankford stated as well that city officials wanted a system which would attract residents to Emporia and "hold the people in public school education, rather than drive them into a private school * * *," Tr.Dec. 18, at 28.

■ Under Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968), and under principles derived from Brown v. Board of

Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), federal courts cannot permit delay or modification in plans for the dismantling of dual school systems for the purpose of making the public system more palatable to some residents, in the hopes that their flight to private schools might be abated. The inevitable consequence of the withdrawal of the city from the existing system would be a substantial increase in the proportion of whites in the schools attended by city residents, and a concomitant decrease in the county schools. The county officials, according to testimony which they have permitted to stand unrebutted, do not embrace the court-ordered unitary plan with enthusiasm. If secession occurs now, some 1,888 Negro county residents must look to this system alone for their education, while it may be anticipated that the proportion of whites in county schools may drop as those who can register in private academies. This Court is most concerned about the possible adverse impact of secession on the effort, under Court direction, to provide a unitary system to the entire class of plaintiffs. This is not to say that the division of existing school administration areas, while under desegregation decree, is impermissible. But this Court must withhold approval "if it cannot be shown that such a plan will further rather than delay conversion to a unitary, nonracial, nondiscriminatory school system,". Monroe v. Board of Commissioners, supra, 391 U.S. 459, 88 S.Ct. 1705. As a court of equity charged with the duty of continuing jurisdiction to the end that there is achieved a successful dismantling of a legally imposed dual system, this Court cannot approve the proposed change.

This Court's conclusion is buttressed by that of the district court in Burleson v. County Board of Election Commissioners, 308 F.Supp. 352 (E.D.Ark., Jan. 22, 1970). There, a section of a school district geographically separate from the main portion of the district and populated principally by whites was enjoined from seceding while desegregation was in progress. The Court so ruled not prin-

cipally because the section's withdrawal was unconstitutionally motivated, although the Court did find that the possibility of a lower Negro population in the schools was "a powerful selling point," Burleson v. County Board of Election Commissioners, supra, 308 F.Supp. 357. Rather, it held that separation was barred where the impact on the remaining students' right to attend fully integrated schools would be substantial, both due to the loss of financial support and the loss of a substantial proportion of white students. This is such a case.

If Emporia desires to operate a quality school system for city students, it may still be able to do so if it presents a plan not having such an impact upon the rest of the area now under order. The contractual arrangement is ended, or soon will be. Emporia may be able to arrive at a system of joint schools, within Virginia law, giving the city more control over the education its pupils receive. Perhaps, too, a separate system might be devised which does not so prejudice the prospects for unitary schools for county as well as city residents. This Court is not without the power to modify the outstanding decree, for good cause shown, if its prospective application seems inequitable.