[No. 44401.   En Banc.   June 9, 1977.]

PUGET SOUND GILLNETTERS ASSOCIATION, ET AL, *Petitioners,* v. DONALD MOOS, ET AL, *Respondents.*

678

*Douglas M. Fryer, Jacob A. Mikkelborg, Charles E. Yates,* and *Henry Haugen* (of *Moriarty, Long, Mikkelborg & Broz*), for petitioners.

*Slade Gorton, Attorney General,* and *James M. Johnson* and *Dennis D. Reynolds, Assistants,* for respondents.

*Joseph T. Mijich* and *John P. World,* for intervenors.

*Peter R. Taft* and *Edmund B. Clark* on behalf of United States Department of Justice and *Alan C. Stay, John Clinebell, Steven S. Anderson,* and *Mason D. Morisset* on behalf of Lummi, Makah, Quileute, Puyallup, Muckleshoot, and Skokomish Indian Tribes, amici curiae.

ROSELLINI, J.—Petitioners are commercial gillnet fishermen who harvest salmon in the waters of Washington state.

They seek a writ of mandate ordering the Director of Fisheries to issue regulations which apply equally and in a nondiscriminatory fashion to both treaty and nontreaty fishermen. They further ask that the Department of Fisheries be ordered to confine its regulation of commercial gillnet fishing to conservation purposes. They also request a declaration that treaty Indians do not have a greater right of access to hatchery–reared fish than do non–Indian fishermen.

By statute, RCW 75.12.010, the Coho season opens on the second Monday of September and lasts through the 30th day of November, unless the Department of Fisheries provides otherwise. This year, according to department estimates, there will be 702,750 Coho salmon available for harvesting after allowing for escapement for the enhancement of future runs. The total estimated market value of the Coho available for harvesting this year is approximately $5 million.

The legislature has declared:

> The preservation of the fishing industry and food fish and shellfish resources of the state of Washington is vital to the state's economy, and effective measures and remedies are necessary to prevent the depletion of these resources.

Laws of 1973, 1st Ex. Sess., ch. 220, § 1, p. 1700.

The federal district court for the Western District of Washington, in *United States v. Washington,* 384 F. Supp. 312 (W.D. Wash. 1974), construed the Medicine Creek and other Indian treaties and held that treaty fishermen were entitled to 50 percent of the harvestable salmon in Puget Sound, plus such salmon as are necessary for ceremonial and subsistence purposes.

This court, in *Department of Game v. Puyallup Tribe, Inc.,* 86 Wn.2d 664, 548 P.2d 1058 (1976), on a direct remand from the United States Supreme Court, *Department of Game v. Puyallup Tribe,* 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973), interpreted the same treaty language to mean that the right accorded the Indians under

the Medicine Creek treaty to fish "in common with others" was a right, not to a certain number or percentage of fish, but to an equal opportunity to fish. We further held that if the treaties guarantee more than this to the Indian signatories, then hatchery–reared fish were beyond the scope of the treaty.

In response to these conflicting court decisions, the department issued a regulation which was designed to allot to treaty Indians 554,400 of the 702,750 Coho available for harvest.

The Superior Court for Thurston County has heard a number of suits[1] challenging the right of the department to promulgate regulations for the apportionment of the catch rather than for conservation purposes. That court has consistently held that regulations promulgated to facilitate the federal court's ruling rather than for the purpose authorized by statute—that of conservation—are beyond the authority of the Department of Fisheries and therefore void.

The Department of Fisheries, in its arguments in open court, requested that the court define its authority in regard to regulation for conservation purposes and to declare whether it has the right to allocate fish. Because of the uniqueness of its position and its evident good faith in attempting to carry out its duties, we decline to issue a writ of mandate but will set forth our opinion upon the questions concerning the authority of the department. We have full confidence that the director will abide by our decision.

The Department of Fisheries, a statutory agency of the state, is established by RCW Title 75, which also defines the extent of its authority to act. RCW 75.08.012 sets forth the duties and purposes of the department. It provides that it shall be its duty to

---

[1]An example of these cases is seen in *Washington State Commercial Passenger Fishing Vessel Ass'n v. Tollefson,* 87 Wn.2d 417, 553 P.2d 113 (1976). Some other cases have been Antone v. Tollefson, Thurston County cause No. 46427; Columbia River Fishermen's Protective Ass'n v. Moos, Thurston County cause No. 55339; Schroeder v. Moos, Thurston County cause No. 55387.

preserve, protect, perpetuate and manage the food fish and shellfish in the waters of the state and the offshore waters thereof to the end that such food fish and shellfish shall not be taken, possessed, sold or disposed of at such times and in such manner as will impair the supply thereof. For the purpose of conservation, and in a manner consistent therewith, the department shall seek to maintain the economic well–being and stability of the commercial fishing industry in the state of Washington.

This court has previously considered the meaning of substantially the same language used with reference to the Department of Game's authority to act. In the case of *Hartman v. State Game Comm'n,* 85 Wn.2d 176, 532 P.2d 614 (1975), this court looked to RCW 77.12.010, which provided as follows:

The game animals . . . *shall be preserved, protected, and perpetuated,* and *to that end* such game animals . . . shall not be taken at such times or places, by such means, in such manner, or in such quantities *as will impair the supply thereof.*

(Italics ours.) We determined that this language gave to the Department of Game the authority to act in matters of conservation only.

The Washington State Legislature has established, in RCW 75.12.010, a fishing season for salmon. The statute provides:

[S]ubject to such seasons and regulations as may be established from time to time by the director, it shall be lawful to fish for commercial purposes . . . for other legal salmon from the second Monday of September to and including the thirtieth day of the following November, except during the hours beginning 4:00 o'clock p.m. of Friday and ending 4:00 o'clock p.m. of the Sunday following . . .

By the terms of this statute, salmon fishing in Puget Sound is open after the second Monday in September unless closed by the regulations of the department. Here, the department is authorized to perform a specific act, but the statute contains in itself no guidelines or limitations.

These are found in RCW 75.08.012, which declares it to be the duty of the department to protect the supply of fish.

A further specific direction is contained in the third proviso of RCW 75.12.010. The proviso states:

> *And provided,* That whenever the director determines that a stock or run of salmon cannot be feasibly and properly harvested in the usual manner, and that such stock or run of salmon may be in danger of being wasted and surplus to natural or artificial spawning requirements, the director may maneuver units of lawful gill net and purse seine gear in any number or equivalents at his discretion, by time and area, to fully utilize such harvestable portions of these salmon runs *for the economic well being of the citizens of this state, . . .*

(Italics ours.)

By this proviso the department is given an affirmative duty to determine whether there are salmon available that are surplus to natural or artificial spawning requirements and, if so, to authorize the harvesting of this surplus, so as to fully utilize the harvestable portions for the economic well–being of the citizens as a whole.

Reading those statutes together, it will be seen that the department has the statutory duty to authorize the harvesting of salmon not required for natural or artificial spawning. It is clear, therefore, that the department may restrict the harvesting of salmon by the commercial fishermen only to the extent that no surplus exists and that the restriction is necessary to prevent the impairment of the supply of salmon.

Supporting the conclusion that the department is authorized to act for conservation purposes only is the fact that there is no other statute regulating commercial fishing which contains any substantive directive to the Department of Fisheries.

An additional expression of legislative intent that the department's activities should be designed to conserve fish is found in the final paragraph of RCW 75.08.012.

> For the purpose of conservation, and in a manner consistent therewith, the department shall seek to maintain the

economic well–being and stability of the commercial fishing industry in the state of Washington.

It has been suggested that RCW 75.08.080 provides authority for the department to act for purposes other than conservation. This section provides, insofar as pertinent:

> The director shall investigate the habits, supply and economic use of, and classify, the food fish and shellfish in the waters of the state and the offshore waters, and from time to time, make, adopt, amend, and promulgate rules and regulations as follows:

There follows a series of paragraphs requiring the director to regulate fishing areas, gear, disposal of fish, landing of fish, destruction of predators, and the prevention and suppression of disease; also to specify types of fish which may be taken and reports which must be made; and the kinds of uses which may be made of particular fish.

RCW 75.08.080 delineates the methods by which the department shall comply with the guidelines set forth in RCW 75.08.012. Nowhere does the section authorize the director to allocate fish among competing claimants for purposes other than conservation. It is obvious that all of the regulations required or authorized are directed to the purpose of conservation.

It is evident that the department's construction of the statutes is the same as ours. There has been introduced at its instance in the last two sessions of the state legislature, legislation which would grant the department this authority to allocate fish among Indians and non–Indians. The most recent bill introduced was House Bill No. 1334, which died in committee in the 1976 session.

As recently as December 11, 1976, the Tacoma News Tribune reported that the Director of Fisheries said he would ask the legislature for the right to allocate fish and the power to set different fishing seasons for non–Indians and treaty Indians. A reasonable inference would appear to be that the department recognizes that it does not have the statutory authority to allocate fish to treaty Indians or to non–Indians.

■ But were we to assume that the Department of Fisheries has the authority to adopt regulations designed for the purpose of allocating fish among competing claimants, we would be confronted by constitutional provisions which stand in the way of its doing so in a manner which discriminates among fishermen of the same class.

Since Indians are citizens of the United States and of this state—and not citizens of a foreign power—they are subject to the constitutions of these governments. The restrictions which these documents place upon governmental action apply to actions taken with regard to these citizens. Thus, they can neither be denied equal protection of the laws nor granted special privileges and immunities. Classification which distinguishes between commercial and noncommercial fishermen has a reasonable basis in fact, which is related to the legitimate governmental purposes of conservation and promotion of the economic welfare of the state. Distinctions between fishermen based upon their race or ethnic background are not proper. Treaties protecting Indian rights in the state's natural resources should be read so as to harmonize their provisions with constitutional mandates if this can reasonably be done. We think the construction which this court placed upon the words "in common with" in the case of *Department of Game v. Puyallup Tribe, Inc.,* 86 Wn.2d 664, 548 P.2d 1058 (1976), achieves this purpose, and accords with the intent expressed in the treaties.

There remains the question whether federal courts can order state agencies to act beyond their authority as defined by state law.

■ The United States Supreme Court has stated that a federal court will not compel governmental officers to do any act which they are not authorized to do by laws of the state from which they derive their power. *Supervisors v. United States,* 85 U.S. (18 Wall.) 71, 21 L. Ed. 771 (1873); *United States v. County of Clark,* 95 U.S. 769, 24 L. Ed. 545 (1878); *Missouri ex rel. Laclede Gas Light Co. v. Murphy,* 170 U.S. 78, 42 L. Ed. 955, 18 S. Ct. 505 (1898).

In *Murphy* the court stated at page 95:

Mandamus lies to compel a party to do that which it is his duty to do, but can confer no new authority, and the party to be coerced must have the power to perform the act.

And following on page 99, the court stated:

The street commissioner had no power under the charter and ordinances to issue the permit requested in the absence of the assent of the board of public improvements, which had general control; *and the court could not command him to do that which it was not his official duty to perform.*

(Italics ours.)

In *Brown v. Environmental Protection Agency*, 521 F.2d 827 (9th Cir. 1975), the Court of Appeals in discussing the relationship of federal and state governments quoted at pages 841–42 with approval the following statement from Hart, *The Relations Between State and Federal Law,* 54 Colum. L. Rev. 515–16 (1954):

Judicial mandates to non–judicial state officers to enforce either primary or remedial duties requiring the performance of affirmative acts are relatively infrequent. Lower federal courts may *prohibit* state officers, in their individual capacity, from taking action under color of office in violation of law. But an action to compel the performance of an affirmative act would encounter, ordinarily, the bar of the Eleventh Amendment. Whether a writ of mandamus to compel performance of a ministerial duty would be regarded as an action against the state is not altogether clear. But it is significant that a practice of issuing such writs to state officers has never become established.

The court further pointed out at page 841:

The Constitution counts upon the necessary participation of the states in the electoral process not by direct command but by the incentive of not losing the opportunity of participation. In similar fashion Congress now elicits desired affirmative performances from the states by attaching them as conditions to the receipt of federal grants–in–aid. If we search the Constitution for provisions which have the appearance of

affirmative requirements, two of the most striking are those which call for the surrender of fugitive slaves and fugitives from justice. But the first was disembowelled by the *tour de force* of *Prigg v. Pennsylvania,* [41 U.S. (16 Pet.) 539, 10 L.Ed. 1060], and the second was flatly held, in *Kentucky v. Denison* [65 U.S. (24 How.) 66, 16 L.Ed. 717], to be judicially unenforceable. "And we think it clear," said Chief Justice Taney in the latter case, "that the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it." Taney's statement can stand today, if we accept [*sic*] from it certain primary duties of state judges and occasional remedial duties of other state officers. Both exceptions, it will be observed, involve enforcement through the orderly and ameliorating forms of the judicial process. In any event, experience with the exceptions does little to bring into question the principle of the rule.

The respondents argue that a federal district court may require a state agency to take affirmative action regardless of the agency's statutory authority. The case upon which they rely is *Griffin v. County School Bd.,* 377 U.S. 218, 12 L. Ed. 2d 256, 84 S. Ct. 1226 (1964). In that case the district court had issued an injunction requiring the court supervisors to levy taxes in order to provide for desegregated schools. The United States Supreme Court, in an opinion upholding the validity of the order, recognized the power of the official to act in accordance with both state law and the court's order saying that the district court's injunction requiring "[s]upervisors to exercise the power that is theirs to levy taxes" and operate schools on a nondiscriminatory basis was properly issued. *Griffin v. County School Bd., supra* at 233.

The cases cited therein involved actions by state officers or agencies which interfered with federal constitutional rights, and in each case the district court issued injunctions enjoining said officers or agencies from engaging in such interference. None of said cases required the state officers or agencies to take affirmative action.

In other cases cited by the respondents, the state officials or agencies ordered by the federal courts to take action, had the power under state law to comply with the federal court order.

The courts have been consistent in recognizing that a state official cannot be compelled to exceed his authority. The court in *Bradley v. School Bd.,* 51 F.R.D. 139, 142 (E.D. Va. 1970), when requested to order affirmative action by a state official, said:

> To be sure, state officials may only be directed, in fulfillment of this duty, to use those powers granted to them by state law. For this reason the relief which may be demanded of state, as opposed to local, officials is restricted . . . In each case, however, the obligation is commensurate with the scope of the power conferred by state law.

In *Wright v. County School Bd.,* 309 F. Supp. 671 (E.D. Va. 1970), the court discussed the scope of a district court's power to effectuate desegregation of a district's schools. At page 677 it said:

> [A] court will only order a public official to perform or refrain from certain acts which are within the powers conferred upon him by law, Bell v. School Board of Powhatan County, 321 F.2d 494 (4th Cir. 1963), and will deny relief when those parties before it are not fully empowered, under state law, to take the action requested, Thaxton v. Vaughan, 321 F.2d 474 (4th Cir. 1963).

It is the duty of judges to declare and not to make law. *Miller v. California,* 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973).

The reason for this restriction is eloquently set forth in the opinion of Justice Harlan in *Oregon v. Mitchell,* 400 U.S. 112, 203, 27 L. Ed. 2d 272, 91 S. Ct. 260 (1970), where he stated:

> [T]he federal judiciary, which by express constitutional provision is appointed for life, and therefore cannot be held responsible by the electorate, has no inherent general authority to establish the norms for the rest of society. It is limited to elaboration and application of the

precepts ordained in the Constitution by the political representatives of the people. When the Court disregards the express intent and understanding of the Framers, it has invaded the realm of the political process to which the amending power was committed, and it has violated the constitutional structure which it is its highest duty to protect.

These principles of federalism were followed most recently in *Rizzo v. Goode,* 423 U.S. 362, 46 L. Ed. 2d 561, 96 S. Ct. 598 (1976), when the Supreme Court reversed a lower federal court's order supervising the handling of citizen complaints within a local police department even though constitutional rights had been violated. The court stated, at pages 379–80:

> The District Court's injunctive order here, significantly revising the internal procedures of the Philadelphia police department, was indisputably a sharp limitation on the department's "latitude in the 'dispatch of its own internal affairs.'"
>
> . . .
>
> Thus the principles of federalism which play such an important part in governing the relationship between federal courts and state governments, though initially expounded and perhaps entitled to their greatest weight in cases where it was sought to enjoin a criminal prosecution in progress, have not been limited either to that situation or indeed to a criminal proceeding itself. We think these principles likewise have applicability where injunctive relief is sought, not against the judicial branch of the state government, but against those in charge of an executive branch of an agency of state or local governments such as respondents here. Indeed, in the recent case of *Mayor v. Educational Equality League,* 415 U. S. 605 [39 L. Ed. 2d 630, 94 S. Ct. 1323] (1974), in which private individuals sought injunctive relief against the Mayor of Philadelphia, we expressly noted the existence of such considerations, saying: "There are also delicate issues of federal–state relationships underlying this case." *Id.,* at 615.

Contrary to the District Court's flat pronouncement that a federal court's legal power to "supervise the functioning of the police department . . . is firmly established," it is the foregoing cases and principles that must govern consideration of the type of injunctive relief granted here. When it injected itself by injunctive decree into the internal disciplinary affairs of this state agency, the District Court departed from these precepts.

The judicial determination of the extent of a state official's authority to act is solely and exclusively within the jurisdiction of the state courts. *Boal v. Metropolitan Museum of Art,* 19 F.2d 454 (2d Cir. 1927), *cert. denied,* 275 U.S. 565, 72 L. Ed. 429, 48 S. Ct. 122 (1927); 21 C.J.S. *Courts* § 524 n.34 (1940). Thus, as we have already observed, the Department of Fisheries is authorized only to promulgate regulations for conservation purposes. It cannot act to comply with a federal court order which imposes  upon it a duty outside its statutory authority.

■ With respect to the weight to be given to the decision in *United States v. Washington,* 384 F. Supp. 312 (W.D. Wash. 1974), it must be remembered that, long before that case came before the federal trial court, the Washington court system had been called upon to interpret the same treaties. On August 15, 1965, the Superior Court for Pierce County passed upon the rights of Indians claiming under the Medicine Creek treaty, both as to steelhead fish and salmon. This court in *Department of Game v. Puyallup Tribe, Inc.,* 70 Wn.2d 245, 422 P.2d 754 (1967), and *Department of Game v. Kautz,* 70 Wn.2d 275, 422 P.2d 771 (1967), began a series of opinions which were to be considered by the United States Supreme Court on two occasions, by the Superior Court on three occasions, and by the Washington State Supreme Court on two additional occasions. (*See Puyallup Tribe v. Department of Game,* 391 U.S. 392, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1967); *Department of Game v. Puyallup Tribe,* 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973); *Department of Game v. Puyallup Tribe, Inc.,* 86 Wn.2d 664, 548 P.2d 1058 (1976).)

In *Department of Game v. Puyallup Tribe, Inc., supra* at 678–79 (1976), we carefully examined both the treaties and the United States Supreme Court decisions that have been rendered concerning the Medicine Creek treaty and other Indian treaties specifically and treaty rights generally. It was said:

> We conclude therefore that a proper interpretation of the Treaty of Medicine Creek permits the State to promulgate conservation regulations meeting appropriate standards that affect all citizens, Indian and non–Indian, equally. However, such regulations cannot deny the Indians access to their usual and accustomed fishing places, nor can they restrain Indian fishing at those places except to the extent the regulations restrain the fishing rights of all state citizens, *e.g.*, regulations as to time and manner of fishing, size of catch, etc.

This interpretation finds support in the decisions rendered by the United States Supreme Court in 1967 and 1973. In *Puyallup Tribe v. Department of Game, supra* (1967), the United States Supreme Court stated, at page 398:

> [W]e see no reason why the right of the Indians may not also be regulated by an appropriate exercise of the police power of the State. The right to fish "at all usual and accustomed" places may, of course, not be qualified by the State, even though all Indians born in the United States are now citizens of the United States. . . . But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.

*Accord, Department of Game v. Puyallup Tribe, supra* (1973).

This court, in *Department of Game v. Puyallup Tribe, Inc., supra* at 682 (1976), stated:

> [I]t is also inconceivable that either the tribe or the government intended the treaty to create any rights beyond the natural run . . . This plain language demonstrates that the rights secured to the tribe under the treaty did not encompass artificially propagated sources of fish. Likewise, the Supreme Court indicated in *Puyallup II*

[*Department of Game v. Puyallup Tribe*, 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973)] that this result is correct. The majority opinion made no comment at all on the issue, but the concurring opinion of Mr. Justice White stated that "the Treaty does not obligate the State of Washington to subsidize the Indian fishery with planted fish paid for by sports fishermen." *Puyallup II* at 49.

Thus, prior to the decision of *United States v. Washington, supra,* there had been a long development of case law, exhibiting an approach by the United States Supreme Court, which, while it was more liberal in its interpretation than was this court, always recognized legitimate state interest in the conservation of its natural resources and never purported to find in the treaties a provision giving the Indians a right to allocations.

We are asked to accede to the federal district court's interpretation of the Medicine Creek and other Indian treaties, whereby it found that treaty Indians have the right to 50 percent of the salmon runs, plus fish for ceremonial and subsistence purposes. It appears that, if this ruling is given effect, non–Indian fishermen will be required to refrain from fishing until the Indians have harvested 50 percent of the fish runs, plus an undetermined additional number of fish.

Being cited no authority for the proposition that federal district courts have exclusive jurisdiction to construe Indian treaties—treaties which affect important interests of the state—we adhere to our own interpretation of the treaty. This interpretation, we believe, results in fairness and justice to all fishermen. It is consistent with the common understanding and practice since the treaties were signed and up until the decision of the federal district judge in *United States v. Washington, supra.* Under our interpretation, treaty Indians have always been afforded the same opportunities as non–Indians to fish commercially by trolling, purse seining, gill netting, or reef netting, and to fish for recreational and other purposes. In addition, they have

been exempt from the payment of license fees which a non-treaty Indian must pay. *See Tulee v. Washington,* 315 U.S. 681, 86 L. Ed. 1115, 62 S. Ct. 862 (1942). And further, state regulations have been subject to the requirement that there be reasonableness applied to treaty Indians. *See State v. McCoy,* 63 Wn.2d 421, 387 P.2d 942 (1963).

We cannot ignore the facts that the holding of the district court has severe economic effect on many nontreaty fishermen; that it will result in the enrichment of some individual treaty Indian fishermen, but will not necessarily result in economic benefit to the tribal units; that it has caused discontent among nontreaty Indians; that it has caused hostility between the treaty and other fishermen, and has jeopardized the good relations heretofore existing among these parties; and that it has resulted in violence and violations of the law. But beyond all of this, it has threatened the survival of the fish runs. Already, the steelhead runs in many of the rivers have been seriously damaged. For example, the Skagit River, which had been the largest steelhead producer in the state, has been depleted to the point that it ranks seventh, and the nontreaty fishing season has been cut from 5 months to 3 months.

All of these facts attest to the soundness of our interpretation of the treaty provisions. They dictate that we should adhere to that interpretation. Our adherence to the decision in *Department of Game v. Puyallup Tribe, Inc.,* 86 Wn.2d 664, 548 P.2d 1058 (1976), makes it unnecessary to consider the petitioners' further contention that treaty Indians are not entitled to a specified percentage of hatchery fish.

We hold that the Director of Fisheries has the authority to pass regulations only for conservation purposes. We hold that he cannot allocate fish to any user of the same class, that every fisherman in a class must be treated equally, and

that each should be given an equal opportunity to fish within lawful statutes and regulations.

WRIGHT, C.J., HAMILTON, and BRACHTENBACH, JJ., and ARMSTRONG, J. Pro Tem., concur.

HOROWITZ, J. (concurring in part; dissenting in part)— The petitions for writ of mandamus in the instant case seek an order compelling the Department of Fisheries of the State of Washington and its director to take action which is violative of the injunction entered in *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974), *aff'd*, 520 F.2d 676 (9th Cir. 1975). Certiorari was denied by the Supreme Court of the United States, 423 U.S. 1086, 47 L. Ed. 2d 97, 96 S. Ct. 877 (1976).

The petitioners, *inter alia,* rely heavily on *Department of Game v. Puyallup Tribe, Inc.,* 86 Wn.2d 664, 548 P.2d 1058 (1976), for its interpretation of the treaty Indian fishing rights under the Treaty of Medicine Creek, 10 Stat. 1132 (1854). The petitioners recognize that "conflict already exists between this Court's opinion in *Puyallup Three,* 86 Wn.2d 664 and *U.S. v. Washington,* on both the issues of hatchery fish and equal opportunity vs. equal fish." Reply Brief of Petitioners at 14.

Petitioners concede that "[w]hether or not the decision of the federal court [*United States v. Washington, supra*] was correct is no longer an issue." Memorandum in Support of Petitioners' Application for a Writ of Mandamus at 7.

Petitioners contend, however, "[t]he only issue now which must be passed upon is how is that judgment properly enforced and who is to bear the brunt and expense of enforcement of it." Memorandum in Support of Petitioners' Application for a Writ of Mandamus at 7. The difficulty with petitioners' quoted contention is that *United States v. Washington, supra* at 389–93, 399–412, 413–20, and particularly at page 416, held that the Department of Fisheries and its director had the authority and were indeed obligated under the supremacy clause to refrain from violating

the District Court injunction. Indeed, the defendants, including the Department of Fisheries and its director, are specifically ordered to "fully observe and to the best of their ability carry out the provisions and purposes of the treaties cited in paragraph 1 of the Findings of Fact," and "conform their regulatory action and enforcement to each and all of the standards set forth in Final Decision #1." *United States v. Washington, supra* at 414. This provision is now final in the federal court system and the Department of Fisheries and its director are bound by the injunction. Moreover, as *United States v. Washington, supra* at 402 states: "Because the right of each treaty tribe to take anadromous fish arises from a treaty with the United States, that right is reserved and protected under the supreme law of the land, does not depend on state law, is distinct from rights or privileges held by others, and may not be qualified by any action of the state."

Since the filing of the petition for the writ of mandamus, the Supreme Court of the United States has granted a writ of certiorari to review the decision in *Department of Game v. Puyallup Tribe, Inc., supra,* on which petitioners rely to define the treaty Indian fishing rights under the Treaty of Medicine Creek, *supra,* and this court has granted a rehearing in *Washington State Commercial Passenger Fishing Vessel Ass'n v. Tollefson,* 87 Wn.2d 417, 553 P.2d 113 (1976), dealing with the powers and duties of the Department of Fisheries and its director in the management of the salmon fisheries of this state. That rehearing will be held in the May 1977 term.

The issues involved in the petition for certiorari which has been granted by the Supreme Court of the United States, have been the subject of briefs by various parties, including an amicus curiae brief filed on behalf of the United States at the invitation of the Supreme Court of the United States to enable the United States to express its views on the issues raised in the petition for certiorari. Whether, or to what extent, the forthcoming decision of the Supreme Court of the United States in the matter on which

it granted certiorari and the forthcoming decision of this court on the rehearing of *Washington State Commercial Passenger Fishing Vessel Ass'n v. Tollefson, supra,* will affect the outcome of the petition before this court, or a like petition should one be filed, remains to be seen.

Meanwhile, however, we must determine the effect we must give to the injunction issued in *United States v. Washington, supra,* which has now become final in the federal system.

There is no claim the injunction issued in *United States v. Washington, supra,* is void because of lack of jurisdiction of the parties and subject matter; nor is there any claim the Department of Fisheries or its director are not bound by that decision as parties to *United States v. Washington, supra.* The claim at most is that the United States District Court erred in ordering the Department of Fisheries and its director to comply with its decision and injunction, petitioners contending such compliance is beyond the authority of the Department of Fisheries and its director. As already pointed out, the United States District Court rejected this contention and the injunction is binding upon the Department of Fisheries and its director.

Accordingly, whether or not this court agrees with the decision in *United States v. Washington, supra,* is no longer the question. As already pointed out, petitioners admit the correctness of this decision "is no longer an issue." It follows that if the Department of Fisheries and its director refuse to obey the federal court injunction, they will be in contempt of the United States District Court and will be subject to sanctions for disobedience. 18 U.S.C. § 401 (1948). This court is powerless to prevent the imposition of those sanctions should the Department of Fisheries or the director violate the federal court injunction, whether or not pursuant to the order of this court.

Under the circumstances presented, if this court is to adhere to the rule that the office of a writ of mandate is to enforce a duty owing, rather than to direct its violation and if due regard is had to protect the integrity of the federal

and state constitutional structure of which this court is a part, then this court must deny the writ and I concur for the reasons stated. *See People ex rel. Ammann v. Dipper,* 392 Ill. 38, 44, 63 N.E.2d 870 (1945); *State ex rel. First Nat'l Bank v. Botkins,* 141 Ohio St. 437, 48 N.E.2d 865, 148 A.L.R. 205 (1943); *cf. State ex rel. Missouri Pac. Ry. v. Williams,* 221 Mo. 227, 255–57, 120 S.W. 740 (1909); *Thomason v. Cooper,* 254 F.2d 808, 810–11 (8th Cir. 1958).

A denial of the petition for writ of mandamus will suffice to dispose of this case. The majority opinion, however, after denying the writ, proceeds to determine the legal authority of the Department of Fisheries of the State of Washington and the Director of Fisheries to observe the Medicine Creek Treaty Indian fishing rights as construed in *United States v. Washington, supra.* They do so because, as it states: "We have full confidence that the director will abide by our decision." The majority opinion ultimately states:

> We hold that the Director of Fisheries has the authority to pass regulations only for conservation purposes. We hold that he cannot allocate fish to any user of the same class, that every fisherman in a class must be treated equally, and that each should be given an equal opportunity to fish within lawful statutes and regulations.

That the interpretation of the Washington statutes is in conflict with *United States v. Washington, supra,* and particularly paragraph 14 of the injunction clearly appears from its text expressly at, *e.g.,* pages 416, 402, and 414.

The effect of the majority's suggestion that the director abide by the majority's decision is to accomplish by indirection what the court has refused to authorize when it refused to grant the writ of mandamus. The injunction in *United States v. Washington, supra,* is expressly made binding upon the "State of Washington; Thor C. Tollefson, Director, Washington State Department of Fisheries; Carl Crouse, Director, Washington Department of Game . . . their agents, officers, employees, successors in interest . . ." *United States v. Washington, supra* at 414.

The same reasons that prevent this court from issuing a writ of mandamus to the Department of Fisheries and its director, and his successors, apply to prevent the court from inviting the Director of Fisheries to accomplish the same result by undertaking to do those things on his own violative of the federal court injunction. I agree with the majority we must deny the writ of mandamus but I dissent from the suggestion of the majority that this court, in effect, invite the Department of Fisheries and its director to take action which would embroil them in contempt proceedings we are powerless to prevent. If the United States District Court, in response to the forthcoming decision of the Supreme Court of the United States in *Department of Game v. Puyallup Tribe, Inc.*, 86 Wn.2d 664, 548 P.2d 1058 (1976), or otherwise, withdraws or modifies its injunction, a different case will be presented.

STAFFORD and UTTER, JJ., concur with HOROWITZ, J.

STAFFORD, J. (concurring with Justice Horowitz)—I concur with the opinion of Justice Horowitz. The Puget Sound Gillnetters Association concession that "[w]hether or not the decision of the federal court [*United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974), *aff'd*, 520 F.2d 676 (9th Cir. 1975)] was correct is no longer an issue" would appear to resolve the basic question before us on the writ of mandamus. However, I am compelled to comment further on *Department of Game v. Puyallup Tribe, Inc.*, 86 Wn.2d 664, 548 P.2d 1058 (1976) (*Puyallup III*) for other reasons. As pointed out by the majority and dissenting opinions, *Puyallup* has now been before the United States Supreme Court on three occasions. At no time has the critical portion of the Treaty of Medicine Creek been interpreted so as to fully dispose of the fishing-right conflict caused by the phrase "in common with all citizens of the Territory." 10 Stat. 1133.

As a result, conflicting interpretations have caused the state and federal courts to drift into positions of direct

conflict. Unfortunately, this has become more than an exercise in legal theory, it has developed into a serious social and economic conflict of major proportions. I do not exaggerate when I say that all too frequently lives and property rights have already hung in the balance.

I cannot stress too strongly that in *Puyallup* III, now on review, the United States Supreme Court should refrain from a limited consideration of the issues. Rather, it should interpret the critical section of the treaty. Such an interpretation by the ultimate legal authority is the only way the current legal, economic and social conflict can be resolved. Most assuredly, this unresolved clash between federal and state judicial systems and between economic and social interests cannot be permitted to continue. Too much is at stake in all areas.

HOROWITZ, J., concurs with STAFFORD, J.

Reconsideration denied October 10, 1977.