-FILED
COURT OF APPEALS
DIVISION II

2013 APR 23 PM 12: 00

STATE OF WASHINGTON

BY____

DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

PUGET SOUND CRAB ASSOCIATION; BRIAN E. ALLISON; JOHN RANTZ; VINTON WALDRON; KENNETH CREWS; BRIAN MELVIN; and BRIAN MACKEY,

Appellants,

v.

STATE OF WASHINGTON and DEPARTMENT OF FISH AND WILDLIFE,

Respondents,

No. 42718-4-II

PUBLISHED OPINION

PENOYAR, J. — The Puget Sound Crab Association (PSCA)[1] is challenging the new Puget Sound Dungeness crab management policy, C-3609, and the rule defining the recreational crab season, WAC 220-56-330, as promulgated by the Department of Fish and Wildlife (the Department). The policy and rule expand the recreational season by adding an additional day a week to the recreational harvesting schedule. PSCA argues that (1) the Department violated its statutory duty under RCW 77.04.012 to improve commercial fishing and to seek to maintain the economic well-being and stability of the fishing industry, (2) the Department acted arbitrarily and capriciously, and (3) PSCA is entitled to attorney fees. We hold that the Department did not violate RCW 77.04.012 because (1) it must allocate a finite resource and it owes a duty to both recreational and commercial harvesters and (2) the fishing industry includes both recreational and commercial harvesters. Additionally, the Department did not act arbitrarily and capriciously, and PSCA is not entitled to attorney fees.

---

[1] PSCA is an association of licensed Puget Sound commercial crab harvesters.

FACTS

There are three groups that harvest Puget Sound Dungeness crab: tribes with treaty rights, commercial harvesters, and recreational harvesters. Every year, the Department and the tribes look at past harvest trends to forecast the amount of harvestable crab. The tribes are allotted half of this amount, and the state is allotted the other half. The state must allocate its share between recreational and commercial harvesters.

In 1982, the state capped the number of Puget Sound commercial permits at 249. The state has not capped the number of recreational permits, and the number of recreational harvesters has doubled between 2001 and 2010. The recreational season is in the summer, and the commercial season begins in October, after the recreational season closes. Additionally, the Department allows a winter recreational season if enough remains of the state's allocation. There is some variance in seasons based on geography.

Because of complaints from both recreational and commercial crab harvesters, the Department revised its Puget Sound crab management policy in 2010. The former policy, adopted in 2000 and modified by regulations in 2004, had established harvest targets for recreational harvesters, restricted recreational harvesting to four days a week—Wednesday through Saturday—and imposed a five crab daily bag limit. Recreational harvesters often exceeded the harvest targets, resulting in a reduced share for the commercial harvesters, who harvest after the close of the recreational season. Since the Department implemented the 2000 policy, the commercial harvest has been approximately 68 percent of the state's allocation and the recreational harvest has been approximately 32 percent. Both recreational and commercial harvesters complained about this policy, and a State Auditor review recommended that the

Department clarify its policy on the commercial/recreational allocation. The Department responded by beginning a policy review.

In October 2010, the Department adopted a new crab management policy, C-3609, after nine months of discussion, public hearings, and public comment. The policy allows a five day a week recreational season—including both weekend days—from July to Labor Day, a five crab daily bag limit, and a seven day a week winter season. This policy differs from the former policy in that it adds an extra day a week in the summer season and it lacks recreational harvest targets. The new policy also requires the Department to provide an annual report summarizing the commercial and recreational harvests and regulation compliance. The policy guidelines focus on conservation and public education to increase compliance with fishing regulations.

As a first step in implementing the new policy, the Department adopted the Recreational Season rule, WAC 220-56-330. The rule allows recreational crab harvesting from July 1 though Labor Day, Thursday through Monday of each week. This adds an additional weekend day to the previous rule. There continues to be some variation to the seasons based on geography. The rule does not include a recreational winter season, but the Department will consider one each year, based on the summer harvest, and establish the parameters using an emergency rule.

In promulgating the rule, the Department considered the rule's conservation and economic impact as required under RCW 77.04.012, which states that the Department "shall conserve . . . shellfish resources" and "shall seek to maintain the economic well-being and stability of the fishing industry." For its conservation analysis, the Department relied on a state performance audit and its own compliance surveys. As part of the new crab management policy, the Department will increase public outreach and education and implement an adaptive management process that requires annual compliance and fishery performance reports. For its

economic analysis, the Department relied on catch data, catch value data from commercial harvesters, and a report from TCW Economics discussing the economic impact of recreational fishing in Washington. The Department considers both recreational and commercial harvesters as part of the "fishing industry" whose economic interests it is mandated to protect under RCW 77.04.012. Administrative Record (AR) at 5. The Department projected that the new policy and rule would result in an increase of recreational crab harvested, an increase in the personal income associated with recreational crabbing, a slight decrease in the ex-vessel value for the commercial harvesters, and a possible 52 percent to 48 percent ratio of commercial to recreational harvesting—a shift from the historic 68 percent to 32 percent ratio.

PSCA challenged the new policy and rule in the superior court, alleging that the Department exceeded its legislative authority and acted arbitrarily and capriciously. The superior court affirmed the validity of the rule and the policy. PSCA appeals.

## ANALYSIS

PSCA argues that the Department acted arbitrarily and capriciously and outside of its legislative authority when it adopted the new Puget Sound crab management policy and accompanying rule. We disagree.

I.  STANDARD OF REVIEW

In a proceeding involving review of a rule, the reviewing court shall declare the rule invalid only if it finds that (1) the rule violates constitutional provisions, (2) the rule exceeds the agency's statutory authority, (3) the rule was adopted without compliance with statutory rule-making procedures, or (4) the rule is arbitrary and capricious. RCW 34.05.570(2)(c). The party asserting the rule's invalidity bears the burden of demonstrating the invalidity. RCW 34.05.570(1)(a). In reviewing an agency rule-making action, we sit in the same position as the

4

42718-4-II

superior court and apply the Administrative Procedure Act[2] standards directly to the agency's administrative record. *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 587, 90 P.3d 659 (2004).

II.    STATUTORY AUTHORITY

PSCA first argues that the Department acted outside its statutory authority as contained in RCW 77.04.012. Specifically, it argues that the Department violated its statutory duty to improve commercial fishing and to seek to maintain the economic well-being and stability of the fishing industry. Because the Department must consider both recreational and commercial interests, it did not violate its statutory duty.

We review a question of statutory interpretation de novo. *Estate of Haselwood v. Bremerton Ice Arena, Inc.*, 166 Wn.2d 489, 497, 210 P.3d 308 (2009). In doing so, we must give effect to a statute's plain meaning. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). We discern plain meaning from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole. *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009). When a statutory term is undefined, we give it its ordinary meaning, which may be discerned from the dictionary. *Estate of Haselwood*, 166 Wn.2d at 498. If, after this inquiry, the statute is susceptible to more than one meaning, we may look to aids of construction and legislative history. *Campbell & Gwinn, LLC*, 146 Wn.2d at 12.

RCW 77.04.012 states that the Department

---

[2] Chapter 34.05 RCW.

shall conserve the wildlife and food fish, game fish, and shellfish resources in a manner that does not impair the resource. In a manner consistent with this goal, the department shall seek to maintain the economic well-being and stability of the fishing industry in the state. The department shall promote orderly fisheries and shall enhance and improve recreational and commercial fishing in this state.

As a preliminary matter, each of these directives uses the word "shall." The word "shall" imposes a mandatory duty unless a contrary legislative intent is apparent. *Schweickert v. Venwest Yachts, Inc.*, 142 Wn. App. 886, 894, 176 P.3d 577 (2008). Thus, the Department has a mandatory duty to conserve shellfish resources, to seek to maintain the economic well-being and stability of the fishing industry, and to enhance and improve recreational and commercial fishing. The issue here is whether the Department acted in compliance with these mandatory duties.

A. Enhancing and Improving Recreational and Commercial Fishing

PCSA first argues that the Department violated the mandate that it shall enhance and improve recreational and commercial fishing because it expanded the recreational season at the expense of commercial harvesters. The Department responds that the fishery resources are finite, meaning that refining seasons to adjust for changing demographics and crab abundance necessarily increases the share for one sector while decreasing it for another. Because the Department must balance its duty to both sectors, we hold that it did not violate this provision.

Although the Department owes a duty to both recreational and commercial sectors, this should not be interpreted as a limitation on the Department's ability to allocate the state's share. PSCA's construction of the statute—that commercial harvesting must be more protected than recreational harvesting—is unworkable where the Department must address both recreational and commercial sectors and where there is competition over a finite resource. Over the years, the state has alternatively restricted commercial and recreational harvests in an attempt to

6

manage both sectors. For example, in 1980, the number of commercial licenses was capped, thereby limiting commercial harvesting. RCW 77.70.110. In 2000, the Department created a crab management policy that limited recreational harvesting. In 2004, the Department further limited recreational harvesting by rules that reduced the number of harvesting days per week and decreased the bag limit. In order to balance both sectors, the Department must necessarily continue to have the flexibility to alter the allocation of the state's share.

The former policy has resulted in a static two-thirds share for commercial harvesters, despite a significant increase in recreational harvesters. The Department is charged with enhancing and improving the recreational harvest as well as the commercial harvest, meaning that it must also respond to the growth in the number of recreational harvesters. The new policy, which is projected to produce close to an equal division between the recreational and commercial harvesters, is an attempt to reasonably allocate the state's share. The duty the Department owes to commercial harvesters must be balanced against the duty it owes to recreational harvesters. PSCA's interpretation is that commercial harvesting must be more protected than recreational harvesting. This is not what the statute requires.

PSCA contends that other provisions within Title 77 RCW evidence a legislative intent to protect commercial harvesters at the expense of recreational harvesters. PSCA points to RCW 77.32.430, which requires recreational harvesters to use catch record cards and obtain endorsements to harvest Dungeness crab, and RCW 77.70.110, which caps the number of Dungeness crab commercial licenses in Puget Sound. Neither statute evidences a legislative intent to protect commercial crab harvesting at the expense of recreational crab harvesting. In fact, both statutes evidence the legislature's intent to balance recreational and commercial

harvesting: one limits commercial harvesting and the other strengthens regulation of recreational harvesting.

PSCA also points to a later portion of RCW 77.04.012 that states "[t]he commission shall attempt to maximize the public recreational game fishing and hunting opportunities of all citizens." PSCA argues that the use of "game fishing," which ostensibly excludes shellfish harvesting, in this provision means that the legislature was directing the Department to not maximize recreational shellfish harvesting. PSCA's argument that "game fishing" excludes shellfish harvesting has merit; however, other provisions in Title 77 RCW, indeed, within the same statute, evidence the legislature's intent to protect recreational harvesting. This includes two instances where the game fishing/shellfish harvesting distinction would also have been made were it the legislature's intention to exempt shellfish harvesting from its mandate to improve recreational fishing. For example, the provision of RCW 77.04.012 at issue here requires the Department to "enhance and improve recreational and commercial fishing"—without limiting recreational fishing to game fishing—and RCW 77.04.055(1) requires the Department to "maximize fishing, hunting, and outdoor recreational opportunities," which, on its face, encompasses recreational crab harvesting. Despite the "game fishing" language in RCW 77.04.012, there is other evidence within Title 77 RCW that the legislature intended to protect recreational crab harvesting, and PSCA has not shown that the legislature intended superior protection for commercial harvesters.

PSCA postulates that the new rule and policy will cause recreational harvesters to continue to grow in number and eventually consume the entire state allocation. This scenario is unlikely. The Department has protected the commercial allocation in the past by reducing the length of the recreational season. Further, even as the number of recreational harvesters has

grown and the recreational harvest has exceeded its harvest targets, the commercial harvesters have continued to receive two-thirds of the state share. Although RCW 77.04.012 does not require the Department to preserve the commercial harvest at the expense of the recreational harvest, it does require a balancing of interests. The 2010 policy allocating a potentially greater share of the harvest to recreational harvesters does not violate the statute, but a policy that completely divested the commercial harvesters of their allocation would.

B.    Economic Well-Being and Stability of the Fishing Industry

PSCA next argues that the Department violated the mandate that it "shall seek to maintain the economic well-being and stability of the fishing industry." Appellant's Br. at 32. The Department interprets "fishing industry" to include both recreational and commercial fishing interests. It therefore considered the economic impact of the new policy and rule on both commercial and recreational harvesters and the businesses that support them. PSCA argues that "fishing industry" is limited to commercial fishing and that it was improper for the Department to consider the impacts of the new policy and rule on businesses that support recreational harvesters. The definition of "fishing industry" is ambiguous, but legislative history supports a construction that includes recreational harvesting.

"Fishing industry" is undefined in the statute. Its plain meaning may be discerned from its ordinary meaning in the dictionary; the context of the statute in which it is found; related provisions; and the statutory scheme as a whole. *Engel*, 166 Wn.2d at 578; *Estate of Haselwood*, 166 Wn.2d at 498. PSCA urges us to adopt the dictionary definition of "fishing industry," arguing that it applies only to activity involving the production and sale of fish. The dictionary defines "industry" as "a group of productive or profit-making enterprises or organizations that have a similar technological structure of production and that produce or supply

9

technically substitutable goods, services, or sources of income." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1155-56.

The Department argues that the text and structure of Title 77 RCW support its consideration of recreational support businesses as part of the fishing industry. First, there is evidence within the statutory scheme that the legislature intended for the Department to consider recreational interests on par with commercial interests. RCW 77.04.012 requires the Department to enhance and improve recreational and commercial fishing and RCW 77.04.055(1) requires the Department to maximize fishing, hunting, and outdoor recreational opportunities. Second, RCW 77.04.012 uses both "fishing industry" and "commercial fishing," implying that the two are not synonymous. These competing definitions of "fishing industry" render it ambiguous; thus, it is necessary to resort to legislative history.

Legislative history supports the Department's interpretation of "fishing industry" as encompassing both recreational and commercial fishing. In 1983, the legislature amended the language in what is now RCW 77.04.012, striking the word "commercial" from the phrase "commercial fishing industry." LAWS OF 1983, 1st Ex. Sess., ch. 46 § 5. This implies that the legislature intended the Department to maintain the well-being and stability of more than just the commercial sector of the fishing industry. The digest discussing the changes to the code confirms this; it states that RCW 75.08.012 (the statute that contained the language of the current RCW 77.04.012) was amended to give "commercial and recreational fisheries co-equal status in [the] Department's management goals." Clerk's Papers at 451 (citing Memorandum from Office of Program Research, House of Representatives, HB 278—Fisheriers Code Revision (Jan. 31, 1983). Given the legislature's expressed intent that commercial and recreational fishing be

treated equally, the Department's consideration of the recreational sector as part of the fishing industry was not improper.

III. ARBITRARY AND CAPRICIOUS

PSCA also argues that the policy and its accompanying rule are arbitrary and capricious because the Department did not project the impact of the rule beyond the first season, the Department increased recreational access in spite of concerns about recreational rule breaking, and the Department did not adequately justify its economic analysis. The Department did not act arbitrarily and capriciously: it committed to annual reviews of the harvest, it addressed compliance concerns in both the rule and policy, and it appropriately considered the economic impacts on both recreational and commercial harvesters.

An agency action is arbitrary and capricious if it is willful and unreasoning and taken without regard to the attending facts or circumstances. *Puget Sound Harvesters Ass'n v. Wash. Dep't of Fish & Wildlife*, 157 Wn. App. 935, 945, 239 P.3d 1140 (2010). The reviewing court must consider the relevant portions of the rule-making file and the agency's explanations for adopting the rule. *Puget Sound Harvesters Ass'n*, 157 Wn. App. at 945. "Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997). We give substantial weight to an agency's determination when it is based on factual matters, especially factual matters within the agency's expertise. *Hillis*, 131 Wn.2d at 396.

42718-4-II

PSCA first argues that the Department acted arbitrarily and capriciously when it failed to project the impact of the new policy and rule beyond the first year. It argues that future projections would reveal that the growing numbers of recreational harvesters will further cut the commercial allocation. The Department responds that it is difficult to predict future fishery outcomes and that the policy and rule require annual reviews of the harvest to determine if changes are needed. In light of the Department's mandatory annual harvest reviews, it was not arbitrary and capricious for it to not project outcomes beyond one year. The Department has a duty to review each harvest and a duty to balance both the recreational and commercial sectors. These mandatory harvest reviews will allow the Department to fairly allocate the state's share in future years. PSCA's argument assumes that the Department will base its allocation on demand alone. This assumption is unfounded where the Department has a duty to balance both sectors and where it has, in the past, limited recreational harvesting when it threatens the commercial share.

PSCA next argues that the Department acted arbitrarily and capriciously when it expanded the recreational season despite problems with recreational rule breaking. The Department responds that it considered compliance issues and included programs in the policy to combat these issues.

The Department did not act arbitrarily and capriciously with regard to compliance issues. First, the Department was aware of and considered compliance issues in formulating the policy and rule. The policy requires the Department to submit an annual report that includes regulation compliance data. The policy guidelines require the Department to develop and implement enhanced enforcement strategies, develop outreach programs with community groups to assist with recreational compliance, and provide increased public access to fishery rules. Further, the

12

concise explanatory statement accompanying the new rule lists five action steps that the Department took in response to compliance concerns: it conducted its own compliance survey, partnered with community organizations to educate the public about regulations, engaged in conversations with the tribes regarding compliance issues, developed a program to remove derelict crab pots, and requested legislative authority to raise the endorsement fee to cover the costs of increased regulation, education, and crab pot removal. These actions align with the State Auditor's suggestions for improving fishery management.

Second, although the Department noted recreational rule violations, the violations were relatively minor, reducing concerns about recreational harvest risks to conservation. For example, in a sample of about 2,000 recreational harvesters, 81 percent of the undersized crab harvested were between 6 and 6.25 inches. The size limit for Puget Sound is 6.25 inches, but it varies along the coast from 5.75 to 6.25 inches. Six-inch crab are large enough to have had at least one or two breeding opportunities, so their removal is less of a threat to conservation. Additionally, increases in recreational harvests have not resulted in decreases of harvestable crab in subsequent years. While there are compliance issues in the recreational sector, they do not appear to create a great conservation risk. Although the Department could have taken a different approach to combat recreational rule breaking, its chosen approach took the relevant facts into consideration and was not arbitrary and capricious.

PSCA also contends that the State Auditor's report suggests that the Department "strengthen" the existing allocation system and that the Department acted arbitrarily and capriciously by ending the existing system rather than strengthening it. Appellant's Br. at 44.

This argument is not persuasive. The report recommends that the Department "clarify" its policy on commercial/recreational allocation. AR at 1471. It does not suggest that the Department only work within or strengthen the existing policy. The Department did not act arbitrarily and capriciously in responding to this recommendation.

Finally, PSCA argues that the Department acted arbitrarily and capriciously regarding its economic justifications for the new policy. PSCA contends that the Department should not have relied on the TCW Economics report analyzing the economics of recreational and commercial fishing and that the Department failed to consider the negative economic impacts of the new policy on commercial fishing. We disagree and hold that the Department appropriately considered the economic report and the possible economic impact on the commercial sector.

It was not arbitrary and capricious for the Department to consider the TCW Economics report. The governor requested the report to summarize the economic impact of both recreational and commercial fishing in Washington. The report found that both fishing sectors contribute to employment, personal income, and quality of life for Washington residents. The report determined that the net economic value of recreational shellfish harvesting was $43 per day. The Department used this number to estimate the economic impact of increasing recreational crab harvesting.

As PSCA correctly points out, the net economic value is not the amount of income generated by recreational harvesters, it is the amount recreational harvesters are willing to pay over and above what they actually pay to fish. The report states that net economic value may be used in a cost-benefit analysis to determine the economic efficiency of policy actions, which is what the Department used it for. Although the Department arguably confused net economic value with personal income, net economic value is an economic indicator that may be useful in

14

making policy decisions; thus, it was not improper for the Department to consider it. Additionally, although the report has limitations—it specifically states that it should not be used to compare recreational and commercial fisheries—the Department did not use the values in the report to compare the two sectors, it used the report to conclude that an increase in recreational harvesting would likely lead to a positive economic impact.

Further, the Department did not fail to consider the possible negative impact of the new rule on the commercial sector. The Department estimated catch data and ex-vessel values for commercial harvesters under the new rule. The Department acknowledged that the rule will likely result in the recreational sector harvesting a larger share of the state's allocation. Additionally, the Department received public testimony from members of PSCA regarding the new rule's impact on commercial harvesters. The Department had information regarding the economic impact on commercial harvesters. It acknowledged this information in the concise explanatory statement and noted the difficulty in allocating a finite resource. The Department's failure to adopt the result that the commercial harvesters advocated does not mean that the Department ignored evidence before it or acted arbitrarily and capriciously. Given the other facts and circumstances before the Department—the increase in recreational harvesters, the economic impact of recreational harvesting, and conservation concerns—the possible negative impact on commercial harvesters does not make the rule arbitrary and capricious.

IV.     ATTORNEY FEES

PSCA argues that it is entitled to attorney fees under RAP 18.1 and RCW 4.84.350, the equal access to justice act (EAJA). Under the EAJA, the "court shall award a qualified party that

15

prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust." PSCA did not prevail, and, as such, it is not entitled to attorney fees.

Affirmed.

Penoyar, J.

We concur:

Quinn-Brintnall, J.

Van Deren, J.