# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

2014 AUG 11 AM 10: 37
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED

| | | |
|---|---|---|
| PUGET SOUND HARVESTERS ASSOCIATION, | ) ) | NO. 71362-1-I |
| Appellant, | ) ) | DIVISION ONE |
| v. | ) ) | |
| WASHINGTON STATE DEPARTMENT OF FISH AND WILDLIFE, and | ) ) ) | |
| Respondent. | ) ) | PUBLISHED OPINION |
| PURSE SEINE VESSEL OWNERS ASSOCIATION, | ) ) ) | FILED: August 11, 2014 |
| Respondent-Intervenor. | ) ) | |

LAU, J. — The Puget Sound Harvesters Association (PSHA), an industry group representing nontreaty commercial salmon gillnet fishers, appeals the trial court's dismissal of its petition seeking to invalidate two administrative rules adopted by the Washington Department of Fish and Wildlife (WDFW) regulating nontreaty commercial chum salmon fishing in South Puget Sound for the 2012 season. PSHA argues that the 2012 rules violate constitutional principles of equal protection and are arbitrary and capricious. Because there is no constitutional or statutory right to equal catch shares among gear groups and the record supports WDFW's determination that the 2012 rules satisfy its statutory obligations and management objectives, we affirm.

## FACTS

WDFW is responsible for managing numerous species of salmon across the state. The agency regulates commercial salmon fishing in Puget Sound by gear type and geographic area. This case concerns the chum salmon fishery in areas 10 and 11 in South Puget Sound. The two major gear types used for commercial chum salmon fishing in South Puget Sound are gillnets and purse seines. Purse seiners have larger boats and utilize gear that is capable of catching significantly more fish per hour than gillnetters.

WDFW annually adopts recreational and commercial salmon fishing schedules following a series of meetings with state, federal, tribal fishery managers, industry representatives, and other stakeholders, in a public planning process known as "North of Falcon." Administrative Record (AR) 3661. The process begins with a preseason salmon run forecast. From this forecast, the treaty tribes and WDFW agree on an allocation of salmon between treaty and nontreaty fishers. Based on this allocation and input from participants in the North of Falcon process, WDFW establishes annual fishing schedules for both tribal-managed and state-managed fisheries. WDFW allocates commercial salmon harvest opportunity for each gear group based on time spent on the water, not on any guaranteed percentage of catch outcome for each group. Nevertheless, fishing opportunity significantly influences catch outcome.

Following the 2012 North of Falcon process, WDFW adopted rules to address commercial salmon harvest in Puget Sound. The 2012 chum fishing schedule in South Puget Sound was similar to schedules implemented each year since 2008. Under

RCW 34.05.325(6)(a), WDFW issued a concise explanatory statement detailing the agency's reasons for adopting the 2012 rules.

WDFW explained that the 2012 rules were developed with respect to the following management objectives, listed in order of priority:

1. Achieve conservation objectives for all species and stocks
   a. Ensure primary stocks meet escapement goals
   b. Minimize by-catch of all non-target species
   c. Monitor fisheries to ensure a & b are met
2. Harvest the non-treaty share of salmon
3. Maintain the economic well-being and stability of the fishing industry (RCW 77.04.012); allow a sustainable level of harvest sufficient to provide opportunity for each gear type (RCW 77.50.120)

AR 3663. The concise explanatory statement paid particular attention to objectives 1(b) and 3, presumably because these are the most controversial.

As to objective 1(b), WDFW explained, "Since bycatch mortalities vary by fishing method, the objective of minimizing bycatch requires WDFW to apply different rules to the different gear types."[1] AR 3663. Based on scientific studies indicating that the majority of Chinook and coho salmon captured in purse seine gear will survive if returned to the water, WDFW concluded that bycatch mortality can be minimized by requiring that purse seine fishers release nontarget salmon. In contrast, because studies demonstrated a significantly higher mortality rate for nontarget salmon captured by gillnets, WDFW prohibits gillnet fishers from discarding nontarget salmon bycatch. Because fewer scientific studies have been conducted on mortality rates for nontarget salmon captured by gillnet gear, WDFW expressed concern that "[t]his lack of data

---

[1] "Bycatch" refers to any nontarget species that is inadvertently captured by fishers. "Bycatch mortality" refers to nontarget species that are killed by contact with deployed fishing gear. Resp't's Br. at 26.

presents a situation of considerable risk that the bycatch minimization objective [for gillnetters] may not currently be achieved." AR 3664.

WDFW further explained that conservation concerns about bycatch of other species, such as rockfish, spiny dogfish, orcas, sea lions, and marbled murrelets, are increasing. WDFW noted that recent data indicate a low bycatch rate for purse seines. But further data collection is necessary to increase confidence that gillnet bycatch mortalities are minimized. WDFW expressed particular concern over the impact of gillnets on seabirds and marine mammals. Because the existing data regarding gillnet bycatch mortality on nonsalmon species is insufficient to verify that bycatch is being minimized, "WDFW is reluctant to provide significant additional or expanded fishing opportunities for gillnet gear . . . ." AR 3665. WDFW indicated that future fishing opportunities, especially for gillnetters, will depend on improved sampling and monitoring programs to accurately assess bycatch impacts.

As to objective 3, WDFW noted that the economic health and stability of the fishing industry depends on many factors beyond its control, such as the price, abundance, and size of salmon; the proportion of license holders who choose to participate; and the catch rates of those who do participate. WDFW's ability to maintain or increase fishing opportunity for nontreaty commercial fishers is further limited by the outcome of negotiation with the treaty tribes. The single factor that WDFW does control is fishing opportunity for each gear type.

WDFW concluded, therefore, that "the most effective means of positively affecting the well-being and stability of the industry is by providing a predictable season structure designed to access the full allowable harvest." AR 3668. To assess the

stability and well-being of the gillnet and purse seine chum salmon commercial fishery in South Puget Sound, WDFW assembled and analyzed catch data, ex-vessel landing value,[2] and the number of licensed vessels by gear type in areas 10, 11 and 12 during the period from 1973 to 2011.[3]

To compare historical averages with current averages, WDFW compared the period from 1973 to 2002 (when WDFW allocated equal fishing time to gillnetters and purse seiners) to the period from 2008 to 2011 (when WDFW allocated a consistent amount of extra time to gillnetters).[4] This method of analysis allowed WDFW to account for the shift in fishing opportunity when comparing historical and current averages. Ex-vessel landing values were adjusted according to the consumer price index to allow for comparison of economic data between years.

From 1973 to 2002, WDFW provided commercial gillnetters and purse seiners in South Puget Sound an equal number of harvest days per year. However, the annual catch statistics varied widely, with gillnetters catching a high of 78 percent in 1977 and a low of 4 percent in 2002. Thus, in 2003, WDFW allowed gillnetters additional harvest time to promote the well-being of that sector of the industry. As the gillnet proportion of the annual catch improved over time, WDFW adjusted fishing schedules to reduce the amount of extra time it allotted to gillnetters. Beginning in 2008, annual fishing

---

[2] "Ex-vessel landing value" refers to the amount of money the fisher receives at the first point of sale. Resp't's Brief at 17.

[3] Because Hood Canal (areas 12A, B, and C) offers significant harvest opportunity for the chum salmon fishery, some documents in the record present a combined analysis for the chum fishery in areas 10, 11, and 12. PSHA, however, challenges only the chum allocation in areas 10 and 11.

[4] WDFW excluded data gathered in 2003 to 2007 from its analysis because fishing schedules were not stable and consistent during that time.

schedules also included additional "market openings" designed to allow South Puget Sound gillnetters the opportunity to supply fish to niche markets for the weekend, with a larger economic benefit than normal openings. Since 2008, fishing schedules have remained consistent.

During the 30-year-period of equal harvest time from 1973 to 2002, purse seiners caught 68 percent of the catch on average, while gillnetters averaged 32 percent of the catch. During the same period, gillnets on average accounted for 78 percent of licenses eligible to participate in the fishery, while purse seines accounted for 22 percent. Changes in the fishing industry over time, most notably a government-sponsored license buyback program, resulted in a dramatic decrease in the total number of licenses and a shift in the proportion of licenses for each gear type over time. As a result, during the period from 2008 to 2011, the gillnet proportion of the fleet dropped to 72 percent and the purse seine proportion increased to 28 percent. This represents a net 6 percent increase in the relative proportion of the purse seine fleet compared with 1973 to 2002. Accordingly, WDFW predicted that the average catch share for gillnets would be expected to drop proportionately from 32 percent (1973–2002) to 26 percent (2008–2011), with the average catch share for purse seines increasing proportionately from 68 percent (1973–2002) to 74 percent (2008–2011).

WDFW found that the results of the 2008–2010 season were consistent with historic catch proportions adjusted for changes to fleet composition. The catch share taken by gillnets during that period averaged 26 percent and the catch share taken by purse seines averaged 74 percent. WDFW thus concluded that the 2011 fishing schedule, which provided similar opportunity to the 2008–2010 schedules, was likely to

result in similar, stable catch proportions for each gear group. However, the actual catch share outcome in 2011 was lower than predicted, with gillnets catching 21 percent and purse seines catching 79 percent of the total catch. WDFW attributed this result to the fact that the average weight of chum in 2011 was well below normal, thereby reducing gillnet harvest efficiency. WDFW expected the catch proportion for 2012 to return to proportions more similar to those seen in 2008–10. For 2008–2011, gillnets averaged 24.4 percent of total catch and purse seines averaged 75.6 percent of total catch. WDFW projected that the 2012 rules would result in catch percentages of approximately 25 percent for gillnets and 75 percent for purse seines. Because these figures are very close to the historic adjusted catch percentages of 26 percent for gillnets and 74 percent for purse seines, WDFW concluded that the 2012 fishing schedule promotes long-term stability for the industry.

WDFW further noted that the consumer price index ex-vessel value of the landed catch has shown an increasing trend for both gear types, due largely to increases in the price per pound paid for chum salmon. WDFW concluded this outcome indicates that recent fishing schedules, including increased gillnet opportunities, have contributed to the overall economic well-being of the fishing industry.

Although WDFW adopted the gillnetters' request for minor modifications to the chum fishing schedule, it rejected their request for a significant increase in fishing opportunity in areas 10 and 11, noting that no supporting rationale was presented and the proposal was opposed by purse seine representatives.

On August 1, 2012, PSHA filed a petition for injunctive relief and declaratory judgment under the Administrative Procedure Act (APA), chapter 34.05 RCW, arguing

that WAC 220-47-411, the rule establishing the 2012 nontreaty commercial chum salmon fishing schedule for gillnetters, is arbitrary and capricious and violates due process and the equal protection clause.[5] The trial court granted the Purse Seine Vessel Owners Association's motion to intervene as a respondent. On February 4, 2013, the trial court issued a letter opinion concluding that no legal basis exists to set aside the 2012 rules. On February 25, 2013, the trial court issued an order denying PSHA's petition. PSHA appeals.

## STANDARDS OF REVIEW

When reviewing an appeal under the APA, "[t]his court sits in the same position as the superior court and applies the APA standards directly to the record before the agency." King County Pub. Hosp. Dist. No. 2 v. Dep't of Health, 178 Wn.2d 363, 372, 309 P.3d 416 (2013). "The agency decision is presumed correct and the challenger bears the burden of proof." Providence Hosp. of Everett v. Dep't of Soc. & Health Servs., 112 Wn.2d 353, 355, 770 P.2d 1040 (1989); RCW 34.05.570(1)(a). Pursuant to the APA, the court will declare a rule invalid only if it finds that the rule (1) violates constitutional provisions, (2) exceeds the statutory authority of the agency, (3) was adopted without compliance with statutory rule-making procedures, or (4) is arbitrary and capricious. RCW 34.05.570(2)(c). "The reviewing court must consider the relevant portions of the rule-making file and the agency's explanations for adopting the rule." Puget Sound Crab Ass'n v. State, 174 Wn. App. 572, 585, 300 P.3d 448 (2013).

---

[5] PSHA did not expressly challenge WAC 220-47-311, the rule establishing the 2012 nontreaty commercial chum salmon fishing schedule for purse seiners. However, any increase in the amount of harvest time for gillnetters established in WAC 220-47-411 would necessarily require a decrease in the harvest time for purse seiners to avoid overharvest.

"[A]gency action is arbitrary and capricious if it is willful and unreasoning and taken without regard to the attending facts and circumstances." Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n, 148 Wn.2d 887, 905, 64 P.3d 606 (2003). "'[I]n reviewing matters within agency discretion, the court shall limit its function to assuring that the agency has exercised its discretion in accordance with law, and shall not itself undertake to exercise the discretion that the legislature has placed in the agency.'" Rios v. Dep't of Labor & Indus., 145 Wn.2d 483, 502 n.12, 39 P.3d 961 (2002) (quoting RCW 34.05.574(1)). "[S]ubstantial judicial deference to agency views [is] appropriate when an agency determination is based heavily on factual matters, especially factual matters which are complex, technical, and close to the heart of the agency's expertise." Hillis v. State, Dept. of Ecology, 131 Wn.2d 373, 396, 932 P.2d 139 (1997). "[S]ubstantial weight is given to the agency's view of the law if it falls within the agency's expertise in that special field of law." Nw. Steelhead & Salmon Council of Trout Unlimited v. Dep't of Fisheries, 78 Wn. App. 778, 786-87, 896 P.2d 1292 (1995).

## ANALYSIS

PSHA argues that WDFW is required to provide an equal catch allocation between gear groups unless it can articulate a rational basis for the disparate treatment. PSHA contends that WDFW has failed to meet this standard because the record does not support the agency's bycatch impact analysis or its conclusion that the fishing schedule maintains the economic well-being and stability of the industry. Therefore, PSHA asserts that the 2012 rules, which maintained the gillnetters' projected catch share at approximately 25 percent, are arbitrary and capricious. WDFW asserts that no statute, case law, or constitutional language requires it to achieve equal catch sharing

among gear groups absent a rational basis for the disparity. It contends that the 2012

rules properly comply with all applicable statutory mandates and management goals

and are supported by the record. PSHA's assertion that WDFW has a duty to equitably

allocate among gear groups is the mainstay of its claim that the 2012 rules were

arbitrary and capricious. We first address the nature and scope of WDFW's statutory

and constitutional duty to gear groups.

Regulatory Framework

RCW 77.04.012 declares WDFW's mandate:

[to] conserve the wildlife and food fish, game fish, and shellfish resources in a manner that does not impair the resource. In a manner consistent with this goal, [WDFW] shall seek to maintain the economic well-being and stability of the fishing industry in the state. The department shall promote orderly fisheries and shall enhance and improve recreational and commercial fishing in this state.

RCW 77.50.120 further provides:

It is the intent of the legislature to ensure that a sustainable level of salmon is made available for harvest for commercial fishers in the state. Maintaining consistent harvest levels has become increasingly difficult with the listing of salmonid species under the federal endangered species act. Without a stable level of harvest, fishers cannot develop niche markets that maximize the economic value of the harvest. New tools and approaches are needed by fish managers to bring increased stability to the industry.

The Washington Fish and Wildlife Commission establishes policy that further guides the

agency in the North of Falcon process. Under the Commission's North of Falcon policy

guidance, WDFW must also ensure that

decisions are made consistent with the Department's statutory authority, U.S. v. Washington, [384 F. Supp. 312 (1974)], U.S. v. Oregon, [Sohappy v. Smith, 302 F. Supp. 899 (1969)], the Endangered Species Act, the Puget Sound Chinook Harvest Management Plan, the Pacific Salmon Treaty, the Pacific Fishery Management Council's Framework Salmon Management Plan, pertinent state/tribal agreements, and the applicable Fish and Wildlife Commission policies.

AR 2934. WDFW established the following management objectives for Puget Sound

commercial salmon fisheries, listed in order of importance:

1. Achieve conservation objectives for all species and stocks
   a. Ensure primary stocks meet escapement goals
   b. Minimize by-catch of all non-target species
   c. Monitor fisheries to ensure a & b are met
2. Harvest the non-treaty share of salmon
3. Maintain the economic well-being and stability of the fishing industry (RCW 77.04.012); allow a sustainable level of harvest sufficient to provide opportunity for each gear type (RCW 77.50.120)

AR 3663.

PSHA's argument relies heavily on Puget Sound Harvesters Ass'n [PSHA] v.

Dep't of Fish & Wildlife, 157 Wn. App. 935, 239 P.3d 1140 (2010). There, Division Two

of this court upheld the trial court's invalidation of WDFW's rules setting the 2008 fall

chum fishing schedule in Puget Sound areas 10 and 11 as arbitrary and capricious.

PSHA is readily distinguishable. At the time WDFW developed the 2008 rules at issue

in that case, its management objectives for Puget Sound commercial salmon fisheries

required it to:

1) Ensure the conversation of target species—meet spawning goals;
2) Minimize catch or impacts on incidental species (bycatch);
3) Monitor and sample all fisheries;
4) Maintain the economic well-being and stability of the fishing industry;
5) Fully utilize the non-Indian allowable catch; and,
6) Fairly allocate harvest opportunity between gear groups.

PSHA, 157 Wn. App. at 947.

The 2008 rules allocated the total available chum harvest between gillnetters and

purse seiners based on fishing opportunity, without attempting to estimate what percent

of the total catch each gear type was likely to obtain as a result. PSHA, 157 Wn. App.

at 943. PSHA argued that the 2008 rules arbitrarily advantaged the purse seiners over

the gillnetters. WDFW asserted that the 2008 rules were not intended to result in any particular catch ratio and that it lacked the data to confidently predict which catch would result from a given allocation of fishing time. PSHA, 157 Wn. App. at 947.

Division Two held that the 2008 rules were arbitrary and capricious. The court noted that "by allocating fishing time, WDFW allocated a share of the fish." PSHA, 157 Wn. App.at 949. The court then evaluated the decision to allocate based on fishing opportunity in light of WDFW's management objectives:

> The decision primarily affects objective number four, to "[m]aintain the economic well-being and stability of the fishing industry," and objective number six, to "[f]airly allocate harvest opportunity between gear groups." These objectives can be met only by allowing both gear groups the opportunity to catch their "fair share" of the fish. Opportunity to catch a share of the fish depends primarily on two factors: time on the water and gear efficiency. Only by considering both of these factors could WDFW rationally accomplish its stated purposes.

PSHA, 157 Wn. App. at 949-50 (alteration in original). Because WDFW had considerable information regarding the likely harvest, yet "simply allocated time on the water without determining the likely effect of this allocation on fish harvest for the two gear groups," the 2008 rules were arbitrary. PSHA, 157 Wn. App. at 950.

Despite surface similarities, this case provides no support for PSHA's assertion that WDFW is expressly mandated to fairly and equitably allocate the harvest between gear groups. PSHA's rationale turned mainly on WDFW's failure to comply with former management objective 6, "fairly allocate harvest opportunity between gear groups." In contrast, the management objective in effect when WDFW developed the 2012 rules requires WDFW to issue rules that "allow a sustainable level of harvest sufficient to provide opportunity for each gear type." AR 3663. The 2012 management objectives no longer specify that the resulting allocation be "fair." PSHA points to no statutory

language expressly requiring that the allocation be fair and equitable. Nor does it argue that WDFW's revised management objectives are arbitrary.

Moreover, PSHA did not hold that WDFW was required to allocate an equal harvest to each gear type. The court emphasized that "WDFW need not be mathematically precise in fairly allocating harvest opportunity" and noted that "a 50-50 allocation, made without regard to the attending facts and circumstances, would be arbitrary and capricious as well." PSHA, 157 Wn. App. at 950. The problem with the 2008 rules at issue in PSHA was WDFW's decision to allocate fishing opportunity without considering the likely impact on total catch for each gear group, not the unequal allocation itself. In contrast, the record shows that WDFW did not repeat this mistake when it developed the 2012 rules. WDFW analyzed the data and projected that the fishing opportunity offered by the 2012 rules would result in catch proportions of approximately 25 percent for gillnets and 75 percent for purse seines.

PSHA next argues that Puget Sound Crab, 174 Wn. App. at 300, confirms WDFW's duty to fairly allocate the commercial chum salmon catch between gillnetters and purse seiners. This case is also distinguishable. In Puget Sound Crab, commercial crab harvesters challenged WDFW's decision to add one day per week to the recreational crab harvest schedule, resulting in a projected 52 percent to 48 percent ratio of commercial to recreational harvesting, down from a historic 68 percent to 32 percent ratio. Puget Sound Crab, 174 Wn. App. at 578. The commercial crabbers argued that WDFW violated its statutory duty to improve commercial fishing. Puget Sound Crab, 174 Wn. App. at 579. Noting that RCW 77.04.012 states that WDFW "shall enhance and improve recreational and commercial fishing in this state," the court

held, "Because the Department must balance its duty to both sectors, we hold that it did not violate this provision." Puget Sound Crab, 174 Wn. App. at 580. But here there is no similar statutory duty to balance allocation among gear types. Moreover, the court in Puget Sound Crab specified, "Although the Department owes a duty to both recreational and commercial sectors, this should not be interpreted as a limitation on the Department's ability to allocate the state's share." Puget Sound Crab, 174 Wn. App. at 580.

WDFW is broadly tasked with managing the fishery resource on a statewide basis. See Nw. Gillnetters Ass'n v. Sandison, 95 Wn.2d 638, 643, 628 P.2d 800 (1981) ("The overriding purpose of the statutes is to provide for wise use of the resource, which is the broadest possible definition of conservation."). "[T]he Department may regulate fish resources with ultimate control as to whether any fish whatsoever may be taken." Purse Seine Vessel Owners Ass'n v. State, 92 Wn. App. 381, 391, 966 P.2d 928 (1998). Commercial fishers do not have a property right in the fish prior to taking. Wash. Kelpers Ass'n v. State, 81 Wn.2d 410, 415, 502 P.2d 1170 (1972). WDFW's duty to maintain the economic well-being and stability of the fishing industry and to allow a sustainable level of harvest sufficient to provide opportunity for each gear type does require it to take the needs of each sector of the fishing industry into account, including gillnetters and purse seiners. WDFW is also required to explain the reasoning behind its decisions. But none of WDFW's statutory mandates or management objectives require its fishery regulations to provide an equal catch allocation between gear groups absent a rational basis for the disparity. And PSHA cites to no controlling authority that imposes such a requirement.

Equal Protection

PSHA further argues that WDFW's failure to allocate equal catch shares between gillnetters and purse seiners, in the absence of a rational basis for doing so, violated the equal protection clause of the federal and state constitutions. Because long-established case law holds that differential fishing gear regulations do not trigger equal protection considerations, this claim is without merit. In Barker v. State Fish Comm'n, 88 Wash. 73, 76, 152 P. 537 (1915), plaintiffs argued that certain state fishing regulations governing fishing gear violated the equal protection clause by favoring purse seiners over gillnetters. The Washington Supreme Court rejected this argument, stating, "It seems plain to us that this is not a discrimination between, or a classification of, persons; but only a discrimination as to appliances which may be used; and that as to each class of such appliances, every person may use them under exactly the same conditions and restrictions." Barker, 88 Wash. at 76. The court stated that questions regarding the wisdom of the state's fisheries regulations should be addressed to the legislature rather than the court. Barker, 88 Wash. at 81. More than 50 years later, the Washington Supreme Court reaffirmed the analysis of Barker and confirmed that differential fishing gear regulations do not violate equal protection. Wash. Kelpers, 81 Wn.2d at 422-23.

PSHA nevertheless cites Puget Sound Gillnetters Ass'n v. Moos, 88 Wn.2d 677, 684, 565 P.2d 1151 (1977) in support of its equal protection argument. There, the court held that regulatory distinctions between treaty tribe fishers and nontribal fishers were constitutionally invalid. Moos, 88 Wn.2d at 684. PSHA's reliance on this case is misplaced. Moos did not purport to overrule Barker or Washington Kelpers Ass'n.

Moreover, in Washington v. Washington Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 660, 99 S. Ct. 3055, 61 L. Ed. 2d 823, modified, 444 U.S. 816 (1979), the Court vacated Moos and remanded it for reconsideration. On remand, the Washington Supreme Court overruled its holdings in previous cases that Indian fishing rights violate equal protection. Puget Sound Gillnetters Ass'n v. Moos, 92 Wn.2d 939, 946, 603 P.2d 819 (1979). Accordingly, we reject PSHA's equal protection challenge.

### Arbitrary and Capricious

Next, PSHA argues that the 2012 rules are arbitrary and capricious because the record does not support WDFW's conclusion that (1) gillnets potentially pose a greater bycatch risk than purses seines and (2) the fishing schedule maintains the economic well-being and stability of the fishing industry, including gillnetters and purse seiners. We reject these arguments.

### Bycatch

PSHA contends that WDFW's justification for denying additional fishing opportunities to the gillnetters based upon concerns over gillnet bycatch impacts is unsupported by the record. PSHA does not challenge WDFW's conclusion that the 2012 rules "'are reasonably constructed to meet the objective to minimize bycatch overall.'" Resp't's Br. at 26 (quoting AR 3665). It instead argues that the record does not support WDFW's conclusion that gillnets may have more adverse bycatch impacts than purse seines.

PSHA argues that WDFW used arbitrary bycatch mortality rates for Chinook salmon in determining that the majority of coho and Chinook salmon captured by purse seine gear will survive being sorted and returned to the water. However, the record

-16-

contains scientific reports that support WDFW's decision. In particular, the 2010–2014 Comprehensive Management Plan for Puget Sound Chinook, which guides the implementation of fisheries in Washington under state and tribal jurisdiction, concluded that the Chinook bycatch mortality rate for purse seines is 45 percent for immature fish and 33 percent for mature fish.

PSHA contends that WDFW disregarded other reports indicating that the majority of nontarget salmon caught by the purse seine fleet do not survive release. PSHA points to a 1997 report of the Chinook Technical Committee (CTC) of the Pacific Salmon Commission, suggesting an aggregated Chinook bycatch mortality rate of 72 percent for purse seines, and a 2012 report authored by consultant Dr. Stephen Mathews. Dr. Mathews concluded that the majority of immature Chinook are dead or badly injured when captured by a purse seine. PSHA also asserts that additional studies showing a lower nontarget salmon bycatch rate for purse seines suffer from various methodological flaws. However, "neither the existence of contradictory evidence nor the possibility of deriving conflicting conclusions from the evidence renders an agency decision arbitrary and capricious." Rios, 145 Wn.2d at 504. WDFW's decision is unquestionably supported by evidence in the record.

PSHA further argues that the record demonstrates that purse seines have a greater impact on nontarget salmon bycatch than gillnets. PSHA points to a 2004 Chinook Technical Committee (CTC) report citing a 50 percent bycatch mortality rate for gillnets under certain circumstances, which is substantially lower than the 90 percent gillnet mortality rate cited in the 1997 CTC report. As WDFW correctly points out, the 2004 report did not replace the 90 percent gillnet bycatch mortality recommendation in

the 1997 report. It cited recent studies suggesting that reductions in release mortality of Chinook salmon captured by gillnets are possible with gear modification, shorter soak times, and changes in handling prior to release. And because WDFW requires gillnet fishers to retain all nontarget salmon bycatch, in practical terms the Puget Sound gillnet bycatch mortality rate is 100 percent. PSHA does not challenge this requirement.

PSHA also points to Dr. Mathews' opinion that purse seines may cause more harm to Chinook salmon than gillnets. However, the record shows that WDFW carefully considered Dr. Mathews' report and rejected this conclusion because the report (1) did not analyze or discuss all available data, (2) did not analyze bycatch impacts to species other than salmon, (3) assumes that fish tickets accurately represent gillnet bycatch, and (4) does not address additional sources of fishing-induced mortality. PSHA further argues that WDFW's 2011 observer data, which had not been scientifically reviewed at the time the 2012 rules were adopted, reveals a high purse seine Chinook bycatch rate. But almost all of this bycatch occurred during the summer pink salmon fishery, which gillnets do not participate in. The same monitoring study shows that monitored purse seiners participating in the fall chum fishery caught only one Chinook salmon. PSHA also asserts that purse seines have a greater bycatch impact because they are currently allowed to catch more fish. But given WDFW's concerns about gillnet mortality rates, if gillnets are given more harvest opportunity, then overall bycatch impacts would be expected to increase, not decrease.

PSHA next argues that the 2012 rules are based on an arbitrary analysis of other nonsalmon bycatch, including marine mammals, spiny dogfish, and seabirds, particularly the endangered marbled murrelet. PSHA points out that no marbled

murrelet fatality has been documented in the Puget Sound chum fishery. But the record contains evidence indicating that because most birds entangled in gillnets are killed, whereas most birds caught in purse seines are released unharmed, gillnets pose a significant risk of harm to seabirds, including marbled murrelets. The record also contains evidence in support of WDFW's concern regarding spiny dogfish, rockfish, and marine mammals.

In sum, there is ample evidence in the record to support WDFW's conclusions regarding bycatch impacts, which in turn supports its decision not to expand fishing opportunity for the gillnet fleet. "Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." Hillis, 131 Wn.2d at 383. Although there may be room for more than one opinion over how to interpret the available data, WDFW's decision was not willful, unreasoning, or made without regard to the facts and circumstances.

Economic Factors

PSHA argues that the 2012 rules, which maintain the gillnetters' expected catch at approximately 25 percent, are arbitrary because they fail to meet management objective 3: "Maintain the economic well-being and stability of the fishing industry (RCW 77.04.012) [and] allow a sustainable level of harvest sufficient to provide opportunity for each gear type (RCW 77.50.120)." AR 3663.

PSHA argues that there is no authority supporting WDFW's decision that providing a predictable season structure designed to access the full allowable harvest will promote the economic well-being and stability of the fishing industry. PSHA suggests that WDFW's true motive is to protect the purse seine fleet at the gillnetters'

expense. This argument is not persuasive. In the concise explanatory statement,

WDFW stated that incorporating predictability as a management approach

> gives fishing businesses the ability to plan for upcoming opportunities and to make business-based decisions about when and where to fish. Significant changes to fishery schedules can be disruptive to individual fishers, gear groups, and the industry as a whole. . . . WDFW believes it is prudent to avoid annual or short-term adjustments to season schedules because there is significant inter-annual variation in fishery performance, and the outcome of a single year may not indicate that an adjustment is appropriate or necessary to achieve this management objective.

AR 3668. PSHA understandably disfavors the adoption of "predictability" as a

management measure because this rationale helps to justify WDFW's decision to

maintain the gillnetters' expected chum catch at approximately 25 percent rather than

increasing it. But WDFW has rationally explained how its decision supports the stability

of the fishing industry.

PSHA next argues that WDFW's adoption of a historic adjusted catch share of 26

percent for gillnetters, representing a 6 percent reduction from the actual 1973 to 2002

average catch share of 32 percent, was unsupported by the record. PSHA contends

that given known differences in gear efficiency, WDFW has failed to explain why it

expected a 6 percent reduction in the size of the gillnet fleet relative to the purse seine

fleet to result in a directly proportional 6 percent reduction in catch share. However,

WDFW's prediction was supported by the data. The analysis completed during the

2011 North of Falcon process showed that the catch share taken by gillnets during the

2008–2010 seasons averaged 26 percent and the catch share taken by purse seines

averaged 74 percent. WDFW noted that the actual catch share outcome for 2011 was

outside the expected range, with gillnets catching 21 percent and purse seines catching

79 percent.

WDFW explored reasons for the discrepancy and concluded that the unusually small average size of chum returning in 2011 decreased gillnet harvest efficiency and resulted in a decrease in the gillnet proportion of total catch. For the 2008–2011 period, gillnets averaged 24.4 percent of total catch and purse seines averaged 75.6 percent of total catch. Because these proportions are very close to the historic adjusted percentages of 26 percent for gillnets and 74 percent for purse seines, WDFW concluded that the 2012 rules promote long-term stability for the industry. This conclusion is not willful, unreasoning, or made without regard to the facts and circumstances.

PSHA next argues that WDFW is "slowly extirpating the gillnet fleet" by repeatedly promulgating arbitrary rules that decrease the gillnet harvest allocation. Br. of Appellant at 33. The record does not support PSHA's assertion. In 2002, the last year that gillnets and purse seines had equal time on the water, the gillnet proportion of the catch dropped to only 5 percent. WDFW immediately responded by increasing fishing opportunity for gillnets, and gillnet catch quickly rebounded. The 2012 rules maintain the predicted gillnet catch share at approximately 25 percent, consistent with recent and historic catch percentages adjusted for changes to fleet size over time. Gillnetters may believe they are entitled to a higher share of the annual catch. But WDFW's decision to stabilize annual catch proportions with the objective of maintaining the economic well-being and stability of the fishing industry does not amount to "extirpating the gillnet fleet."

PSHA next argues that WDFW's attempt to rationalize its allocation based on historic and expected income per license fails to promote economic well-being and

stability because the gillnetters had a three-fold increase, whereas the purse seiners had an almost five-fold increase. As discussed above, WDFW is not required to spread the benefits of fisheries regulations equally among gear groups. It is mandated to promote the economic well-being and stability of the entire industry and provide opportunity for each gear type. WDFW's refusal to adopt the gillnetters' request for more fishing opportunity does not render the decision arbitrary.

In sum, WDFW's decision to stabilize predicted annual catch levels at approximately 25 percent for gillnetters and 75 percent for purse seiners was not arbitrary and capricious. The record amply supports WDFW's concerns regarding the impact of gillnets on bycatch and WDFW's conclusion that stabilizing catch percentages at this level promotes the economic well-being and stability of the fishing industry and provides opportunity for both gear types.

## CONCLUSION

Because WDFW's 2012 rules were not arbitrary and capricious and PSHA's equal protection argument is without merit, we affirm the trial court's order dismissing PSHA's petition.

WE CONCUR: